J-S49009-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| K.S., FORMERLY K.L. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| J.L. | : | |
| | : | |
| Appellant | : | No. 357 MDA 2018 |

Appeal from the Order Entered January 24, 2018
In the Court of Common Pleas of Huntingdon County Civil Division at
No(s): CP-31-CV-1600-2011

BEFORE: SHOGAN, J., STABILE, J., and STEVENS*, P.J.E.

MEMORANDUM BY SHOGAN, J.: **FILED SEPTEMBER 21, 2018**

Appellant, J.L., appeals from the contempt order entered on January 24, 2018, for his violation of a no-contact order between Appellant and his ex-wife, K.S., in this custody case. Following a contempt hearing, the trial court found Appellant "in indirect criminal contempt" and ordered him to pay a $200 fine and serve a fifteen-day suspended sentence.[1] N.T., 1/24/18, at 42. We reverse.

---

[1] While not raised as an issue in this case, the sentence imposed is an illegal sentence. **See Thompson v. Thompson**, 187 A.3d 259, 264 (Pa. Super. 2018) ("The law is clear that an indefinitely suspended sentence is not a sentencing alternative and is illegal."). "It is the uncertainty surrounding such sentences, and the disorder they can engender, that prompts their prohibition." **Id.** (citing **Commonwealth v. Joseph**, 848 A.2d 934, 941–942 (Pa. Super. 2004). While this Court can consider an issue of legality of sentence *sua sponte*, **Commonwealth v. Orellana**, 86 A.3d 877, 882–883

---

\* Former Justice specially assigned to the Superior Court.

The trial court set forth the following findings of fact in its Pa.R.A.P. 1925(a) opinion:

1. [K.S.] . . . filed for divorce from [Appellant] in 2011.

2. On December 13, 2011, then President Judge Stewart L. Kurtz entered an Order prohibiting contact between the parties.[2]

3. The December 13, 2011, Order explicitly stated that a violation of the no–contact provision would result in contempt of Court.

4. [Appellant] had knowledge of the December 13, 2011 Order as well as the provision within the Order stating violation of such would result in a finding of contempt of court.

5. Both parties, and [C.L.,] the current wife of [Appellant], acknowledged at [the] hearing that the no contact Order was in operation at the time of the incidents in question.

_____

n.7 (Pa. Super. 2014), we need not discuss the sentence because we have concluded that the order of contempt must be reversed.

[2] The order K.S. attached to her contempt petition was dated December 13, 2011.  On May 21, 2013, the Huntingdon County Court of Common Pleas vacated the December 13, 2011 order and replaced it with an order stating, in pertinent part:

It is the further ORDER of this [c]ourt that the parties shall have no contact with each other for any purpose and that if either violates this order, that fact shall be the basis for the issuance of a bench warrant.

Order, 5/21/13.  At the contempt hearing, counsel for K.S. informed the trial court that she had attached the wrong order to the contempt petition.  N.T., 1/24/18, at 1.  Counsel did not indicate which order properly should have been attached.  *Id*.  In its contempt order, the trial court stated that Appellant violated the May 21, 2013 order, but in its Pa.R.A.P. 1925(a) opinion, it referred solely to the December 13, 2011 order that had been vacated.  Order, 5/21/13; Trial Court Opinion, 4/18/18.

6. Both parties acknowledged at [the] hearing that they were not to have contact with each other.

7. This case has been highly contentious since its inception, with unreasonable behavior on behalf of both parties. (Although the undersigned was not the trial judge at the time of the other proceedings, we conducted a thorough review of the prior proceedings before the hearing in question).

8. On September 2, 2017, [Appellant] commented on a post [K.S.] had made on her Facebook page. [Appellant's] explanation as to how and why the comment appeared on [K.S.'s] Facebook page was not credible.

9. On September 26, 2017, attorney for [K.S.] . . . wrote a letter to [Appellant's] attorney . . . notifying him of the recent contact on social media. The letter advised that further contact by [Appellant] could cause the initiation of a contempt filing.

10. On December 12, 2017, [Appellant] and his wife arrived approximately 10 minutes before the start of a school concert and sat immediately in front of [K.S.]

11. [Appellant] acknowledged that he and his wife sat directly in front of [K.S.] and daughter, but he attempted to justify his conduct by testifying that those seats were the only available seats in the school auditorium remaining by the time he arrived for the concert. [Appellant's] explanation lacks credibility.

12. [Appellant] made eye contact with [K.S.] before sitting down at the concert.

13. There were many available seats remaining in the auditorium when [Appellant] and his wife arrived at the concert.

14. [Appellant] initiated conversation with the parties' daughter who was sitting adjacent [to K.S.]

15. On January 9, 2018, [K.S.] attended a basketball game at Altoona Area High School, at which the daughter of

- 3 -

the parties sang the National Anthem. [K.S.] sat at the scorer's table at the half-court line in the gym.

16. [Appellant] and his wife sat in the first row of bleachers directly behind [K.S.], even though the gym was "by no means close to full."

17. On three occasions [Appellant] violated the no contact Order issued by then President Judge Stewart L. Kurtz.

Trial Court Opinion, 4/18/18, at 1–2.

The trial court held a contempt hearing on January 24, 2018. Both parties were represented by counsel, and both parties testified, as did C.L. Following the hearing, the trial court entered the following order:

AND NOW, January 24, 2018, the [c]ourt finds [Appellant] in indirect criminal contempt for a violation of this [c]ourt's May 21, 2013 Order.

IT IS THE SENTENCE OF THE COURT that [Appellant] pay a fine of $200.00 and serve 15 days in the HUNTINGDON COUNTY JAIL. This Sentence is suspended on the following conditions:

1. That on or before February 23, 2018[, Appellant] pay the fine of $200.00 to the HUNTINGDON COUNTY PROBATION DEPARTMENT; and

2. That on or before February 23, 2018[, Appellant] pay the sum of $200.00 to the guardian ad litem, RAY A. GHANER, Esquire, for his services in appearing in court today.

Failure to follow the two conditions in this Order on or before February 23, 2018 shall result in the issuance of a Bench Warrant and [Appellant] shall be remanded to the HUNTINGDON COUNTY JAIL to serve the Sentence imposed this date.

Order, 1/24/18. Appellant filed a notice of appeal on February 22, 2018. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

J-S49009-18

Appellant raises the following issue on appeal: "Whether the trial court abused its discretion in concluding the Appellant had intentionally violated a clear and specific court order beyond a reasonable doubt[?]" Appellant's Brief at 5 (unnecessary capitalization omitted).[3]

_____

[3] Appellant failed to address whether the instant contempt constituted criminal or civil contempt, despite the trial court's moniker of indirect criminal contempt. "Contempt does not automatically become categorized as criminal upon a lower court so holding." *Bruzzi v. Bruzzi*, 481 A.2d 648, 651 (Pa. Super. 1984). As noted *infra* note 9, the order allegedly violated was not entered pursuant to the Protection from Abuse Act nor was it a restraining order or injunction. We have stated:

> The factors generally said to point to a civil contempt are these: (1) where the complainant is a private person as opposed to the government or a governmental agency; (2) where the proceeding is entitled (captioned) in the original...action and filed as a continuation thereof as opposed to a separate and independent action; (3) where holding the respondent in contempt affords relief to a private party; (4) where the relief requested is primarily for the benefit of the complainant; and (5) where the acts of contempt complained of are primarily civil in nature and do not of themselves constitute crimes or conduct by the respondent so contumelious that the court is impelled to act on its own motion.

*Stahl v. Redcay*, 897 A.2d 478, 486 (Pa. Super. 2006). Moreover:

> the characteristic that distinguishes civil from criminal contempt is the ability of the contemnor to purge himself of contempt by complying with the court's directive. If he is given an opportunity to purge himself before imposition of punishment, the contempt order is civil in nature. If the purpose of the order is to punish despite an opportunity to purge, the order is criminal in nature.

*Sinaiko v. Sinaiko*, 664 A.2d 1005, 1009 (1995). Thus, these factors point to classifying the contempt as civil.

- 5 -

An order of contempt is final and appealable "when the order contains a present finding of contempt and imposes sanctions." ***In re K.K.***, 957 A.2d 298, 303 (Pa.Super.2008) (citations omitted). Therefore, the order at issue is final and appealable. ***In re C.W.***, 960 A.2d 458, 460 (Pa. Super. 2008). When reviewing a contempt conviction, "much reliance is given to the discretion of the trial judge." ***Id.*** at 466. Thus, "we are confined to a determination of whether the facts support the trial court's decision. Each court is the exclusive judge of contempts against its process, and on appeal its actions will be reversed only when a plain abuse of discretion occurs." ***Id.***

The trial court found Appellant to be in indirect criminal contempt.

> A charge of indirect criminal contempt consists of a claim that a violation of an Order or Decree of court occurred outside the presence of the court. ***Commonwealth v. Padilla***, 2005 PA Super 332, 885 A.2d 994 (Pa. Super. 2005). . . . To establish indirect criminal contempt, the Commonwealth must prove: 1) the Order was sufficiently definite, clear, and specific to the contemnor as to leave no doubt of the conduct prohibited; 2) the contemnor had notice of the Order; (3) the act constituting the

_____

On the other hand, "criminal contempt is of a punitive character." ***Bruzzi***, 481 A.2d at 651. Here, the trial court was punishing Appellant for past acts of noncompliance. "A civil label is inappropriate when the court is attempting to punish the contemnor for past acts of misbehavior . . . ." ***Id***.

Instantly, the trial court provided a condition upon which Appellant could purge himself, which is a key feature distinguishing civil and criminal contempt. ***Bruzzi***, 481 A.2d at 652. We have stated that "the same facts or conduct may constitute or amount to both civil and criminal contempt." ***Stahl***, 897 A.2d at 486. However, because both civil and criminal contempt require proof of the distinct elements of clarity of order, notice, volition, and intent, we address the requisite elements as applied to the trial court's stated order of indirect criminal contempt.

violation must have been volitional; and 4) the contemnor must have acted with wrongful intent.

***Commonwealth v. Brumbaugh***, 932 A.2d 108, 110 (Pa. Super. 2007).

Thus, we look first to the language of the order allegedly violated to determine whether it is sufficiently definite, clear, and specific, such that Appellant had no doubt of the conduct prohibited. As noted *supra*, K.S. attached the December 13, 2011 order, which had been vacated and replaced by the order dated May 21, 2013, to her contempt petition. Despite K.S.'s identification of this error at the hearing, the trial court, in its findings of fact, continued to refer and rely on the December 13, 2011 order. Trial Court Opinion, 4/18/18, at 1 (Findings of Fact 2–4). Similarly, in setting forth its analysis in its opinion, the trial court referenced only the vacated December 13, 2011 order. Trial Court Opinion, 4/18/18, at 2. Thus, in this procedural posture, we observe that while the trial court's contempt order found Appellant to have violated the order entered May 21, 2013, its entire analysis in its opinion related to the previously vacated order dated December 13, 2011.

Despite this discrepancy, because the order appealed identified the May 21, 2013 order, we confine our evaluation of clarity to that order.[4] The

---

[4] In his brief, Appellant vaguely asserts that a November 21, 2016 custody order set aside all previous orders in the case. Appellant's Brief at 11. To the extent this is an attempt to claim the May 21, 2013 order has been vacated as well, that contention is waived by Appellant's failure to raise the issue in

relevant portion of the May 21, 2013 order states, "It is the further ORDER of this court that the parties shall have no contact with each other for any purpose . . . ." Order, 5/21/13. This order is not the model of clarity and specificity; rather, it is generic and general. Nevertheless, we examine whether Appellant's actions constituted proscribed "contact." The contact alleged in the contempt petition was that Appellant "commented on a post that [K.S.] had made on Facebook," and that Appellant "sat directly in front of [K.S.] at a concert." Petition for Contempt, 1/9/18, at unnumbered 1.[5]

At the contempt hearing, K.S. complained Appellant "commented" on one of her Facebook posts, however she did not have documentary evidence[6]

_____

his Pa.R.A.P. 1925(b) statement. *See* Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived."); ***Nexus Real Estate, LLC v. Erickson***, 174 A.3d 1, 4 (Pa. Super. 2017) (same).

[5] At the contempt hearing, counsel for K.S. also introduced alleged conduct that Appellant sat in the row behind K.S. at a basketball game on January 9, 2018. Because such behavior was not identified in the contempt petition, we do not consider its propriety. However, even if Appellant properly had been given notice of that conduct, our evaluation of it would comport with our consideration of Appellant's conduct sitting in proximity to K.S. at the jazz concert.

[6] Because the proper authentication of the Facebook post has not been raised as an issue and therefore, is not before us, we note only that the proponent of social media evidence "must present direct or circumstantial evidence that tends to corroborate the identity of the author of the communication in question, such as testimony from the person who sent or received the communication, or contextual clues in the communication tending to reveal the identity of the sender." ***Commonwealth v. Mangel***, 181 A.3d 1154, 1162 (Pa. Super. 2018).

- 8 -

revealing the nature of the comment.[7] N.T., 1/24/18, at 3, 14. Both parties testified that they are not Facebook "friends." *Id*. at 28–29. In fact, both parties testified that the other has been "blocked" from his or her account for years, although K.S. testified that she blocked Appellant only ninety percent of the time in order to "see if there were some things going on that may have been of a concern" to the parties' children. *Id*. at 14, 15, 29. K.S. stated that she posted photographs of their children taken at a football game on Facebook and admitted that the parties possibly have "friends" in common. *Id*. at 15. There was no explanation offered at the hearing regarding how Appellant could have commented on a post by K.S. because they are not Facebook friends. Appellant did acknowledge that he commented on a post by a mutual friend that included photographs of the parties' children, but he stated that posts by K.S. never appear on his cell phone. *Id*. at 34. The trial court did not analyze the propriety of the Facebook allegation in its opinion. Pursuant to our review of the record, the testimony, at most, established that Appellant commented on a picture of his children that appeared on a third party's Facebook page that perhaps originally had been posted by K.S. In the absence of documentary proof that Appellant commented on a post by K.S., including the

_____

[7] K.S. attached to her contempt petition a photograph of a screen shot allegedly from her Facebook profile indicating that Appellant made a comment to a Facebook post by K.S. Contempt Petition, 1/9/18, at Exhibit A. The photograph did not reveal the alleged comment by Appellant, and did not clarify on whose profile either the post or the comment appeared.

nature of the comment, this tenuous behavior does not constitute "contact" by Appellant.

Similarly, the fact that Appellant and K.S. found themselves seated one row apart at their son's school jazz concert, when K.S. was seated first, does not compel the conclusion that Appellant intentionally had contact with K.S. in violation of the May 21, 2013 order. Appellant explained that he had no idea K.S. was seated behind him until he noticed his daughter as the concert was about to begin. N.T., 1/24/18, at 31–32. The questioning by counsel for K.S. continually focused on the distance, in feet, that Appellant was from K.S. *Id*. at 7, 8, 36, 37. Despite K.S.'s apparent wish[8] that Appellant stay at least ten feet away from her, the May 21, 2013 order did not specifically direct the parties to be a certain distance apart. Order, 5/21/13.

The lack of analysis by the trial court has impacted our review. None of the trial court's findings of fact include any reference to the record and therefore, they are cited without any substantiation. Moreover, some of the findings lack support in the record. For example, in Finding of Fact 11, the trial court stated that Appellant "attempted to justify his conduct" of sitting in front of K.S. at the December 12, 2017 school concert "by testifying that those seats were the only available seats in the school auditorium remaining by the

---

[8] K.S. testified that her counsel sent a letter dated September 26, 2017, to Appellant's counsel stating, in part, "[W]e would ask that [Appellant] stand at least ten feet away from [K.S.] at all times." N.T., 1/24/18, at 4–5.

time he arrived for the concert." Trial Court Opinion, 4/18/18, at 2. Our review of the notes of testimony does not substantiate the trial court's finding of fact. Indeed, Appellant made no such claim. In fact, Appellant testified to the exact opposite, that there **were** other seats available in the auditorium. N.T., 1/24/18, at 36. Appellant's testimony regarding choosing the seats at the concert consisted of the following testimony:

Q. [By Appellant's counsel]: The December 12th concert, you heard [C.L.] testify with respect to that?

A. [By Appellant]: Yes.

Q. Do you recall going to that concert?

A. I do.

Q. Do you recall seeing [K.S.] before you sat down?

A. No. It is my practice at all of our shared children's events to look for her, look around and stay away the best I can . . . . I don't want to be near her. It makes our household uncomfortable.

Take me back to the question. I was digressing. So at the concert we walked in around 6:53 or so. There was a string quartet on stage of students getting ready to start. When I come in that auditorium and look around . . . [K.S.] is probably . . . my first and constant thought [to] avoid her. I said to [C.L.] as we were at the back of the auditorium, I don't see her anywhere. Let's try to get up front so we can get some good pictures because quite often than [sic] most of these concerts we'll stay much farther back and get a picture of the backs of a lot of people's heads.

So as we walked forward we're looking for spaces where maybe we could go. We saw that a lot of the chairs up front were reserved for the performers, taped off or such, but then we spied two seats right up front in the third row, two rows in front of us. We—I got there and didn't look to see who was sitting behind those two seats. I did take a moment to ask the people next to

- 11 -

those two seats in the same row are these taken and they said it's fine. Given the fact that it was 6:54 by now and there's a group on stage almost getting ready to perform, we jumped on those seats.

N.T., 1/24/18, at 31–32.

Appellant never attempted to justify choosing seats in a row in front of K.S. with the claim that there was nowhere else to sit. Rather, he testified that he never saw K.S., despite looking for her initially. This is noteworthy because the trial court's representation of Appellant's testimony served as the basis for its credibility determination. Trial Court Opinion, 4/18/18, at 2 (Findings of Fact 11). As that representation lacks the requisite measure of support in the record, there is no actual basis for the credibility determination offered by the trial court. Indeed, the identified reason for the trial court's rejection of Appellant's testimony does not exist. Therefore, the credibility determination is a nullity. *Accord M.J.M. v. M.L.G.*, 63 A.3d 331, 334 (Pa. Super. 2013) (Superior Court must accept credibility determinations by the trial court **only when they are supported by competent evidence of record**); *McElwee v. Southeastern Pennsylvania Transp. Authority*, 948 A.2d 762, 774 n.10 (Pa. 2008) (trial court, as fact finder, may reject witness's testimony on credibility grounds, but may not do so arbitrarily); *cf. Daniels v. W.C.A.B. (Tristate Transp.)*, 828 A.2d 1043, 1053 (Pa. 2003) ("[A]bsent the circumstance where a credibility assessment may be said to have been tied to the inherently subjective circumstance of witness demeanor, some articulation of the actual objective basis for the credibility determination must

be offered for the decision to be a 'reasoned' one which facilitates effective appellate review.").

Appellant also argues that any violation of the relevant order was not intentional. Appellant's Brief at 14. This claim relates to the requirement that the contemnor must have acted with wrongful intent. ***Brumbaugh***, 932 A.2d at 110. "[W]hen making a determination regarding whether a defendant acted with wrongful intent, the court should use common sense and consider context . . . ." ***Commonwealth v. Reese***, 156 A.3d 1250, 1258 (Pa. Super. 2017), *appeal denied*, 173 A.3d 1109 (Pa. 2017); ***see also Commonwealth v. Haigh***, 874 A.2d 1174, 1177 (Pa. Super. 2005) (Trial courts must "use common sense and consider the context and surrounding factors in making their determinations of whether a violation of court order is truly *intentional* before imposing sanctions of criminal contempt.") (emphasis in original).

The trial court stated, without reference to the record, that the parties "operated pursuant to the no-contact order for six years, before [Appellant] began making intentional contact with [K.S.] at their children's school functions." Trial Court Opinion, 4/18/18, at 2–3. There is no testimony in the record that supports a finding of intentional contact. Appellant testified that in light of the fact that the parties share custody of their children and frequently find themselves at the same venues in support of their children's activities, Appellant makes every effort to avoid K.S. N.T., 1/24/18, at 31–32. Moreover, Appellant has made it his "practice at all of our shared

children's events to look for her, look around and stay away the best I can . . . ." *Id*. at 31. Regarding the instances of alleged contact discussed herein, he has blocked K.S. from his Facebook account, and he surveyed the auditorium to look for K.S. so as to avoid her. *Id*. at 29, 31–32. It is noteworthy that upon realizing he was seated in front of K.S. at the jazz concert, Appellant did not speak or acknowledge her; K.S. admitted as much. *Id*. at 8. Indeed, if that had not been the case, we would agree that Appellant exhibited wrongful intent because it could be imputed from that conduct. *Brumbaugh*, 932 A.2d at 111. As we noted in *Haigh*, in light of common sense and reasoned judgment, and considering the record as a whole, we cannot say Appellant exhibited wrongful intent.[9]

Contempt order of January 24, 2018, is reversed.[10] Any monies paid as

---

[9] We acknowledge and underscore the comments of the guardian *ad litem*, who did not file a brief in this case but who was present at the contempt hearing, that "the whole thing is pretty sad that these people cannot communicate under any circumstances. But what I'm hearing is not—I don't know. It doesn't strike me as intentional." N.T., 1/24/18, at 27.

[10] As we have determined that the finding of contempt cannot stand in this case, the propriety of the court's sentence is not before us. Indeed, Appellant has not challenged the sentence imposed in this case. We note, however, that "[i]ndirect criminal contempt is usually punishable by fine only." 42 Pa.C.S. § 4133 ("Except as otherwise provided by statute, the punishment of commitment for contempt provided in section 4132 (relating to attachment and summary punishment for contempts) shall extend only to contempts committed in open court. All other contempts shall be punished by fine only."). There are exceptions for violations of orders pursuant to the Protection from Abuse Act, which are punishable by both fine and imprisonment, 23 Pa.C.S. § 6114, and indirect criminal contempt resulting

a result of the fine imposed shall be returned to Appellant. Jurisdiction relinquished.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 09/21/2018

---

from violation of a restraining order or injunction, which may be punishable by imprisonment not exceeding fifteen days. 42 Pa.C.S. § 4136(b). The order alleged to have been violated in the instant case was neither of these.