OPINION BY MUSMANNO, J.:
The Commonwealth of Pennsylvania appeals from the Order denying its Motion in Limine to introduce Facebook posts and messages allegedly authored by defendant Tyler Kristian Mangel ("Mangel"). We affirm.
On June 26, 2016, Nathan Cornell ("Cornell") was assaulted at a graduation party. On July 15, 2016, a Criminal Complaint was filed against Mangel, at CR 2939 of 2016, charging him with aggravated assault, simple assault and harassment of Cornell. See 18 Pa.C.S.A. §§ 2702(a)(1), 2701(a)(1), 2709(a)(1). At CR 2940 of 2016, the Commonwealth filed a separate Criminal Complaint against Matthew Robert Craft ("Craft"), charging him with the same offenses. The criminal cases against Mangel and Craft were consolidated for trial. Attached to the Criminal Complaints was an Affidavit of Probable Cause,[1] which indicated that Cornell had told police that "several fights ensued as a result of an undetermined amount of people arriving" at the party. Affidavit of Probable Cause, 7/15/16, at 1. Cornell had further stated that "he was walking away from where these altercations were taking place when he was struck in the back of the head[,] knocked to the ground[,]" and "was repeatedly kicked and punched by [ ] Mangel [ ] and [ ] Craft [ ]." Id. Cornell also stated that he did not know Mangel or Craft, "nor had he been in contact with them during the course of the night, but he was *1156 able to identify them as a result of being shown Facebook pictures by his family." Id. As a result of the assault, Cornell suffered facial lacerations, a broken maxilla bone, a broken nasal bone, and seven of his teeth were knocked out. Id.
On March 15, 2017, the Commonwealth filed a Motion for Provider to Provide Subscriber Information, pursuant to 18 U.S.C. § 2307(c) and 18 Pa.C.S.A. § 5743(c) and (d), seeking to obtain Mangel's Facebook records. The trial court granted the Motion on that same date. At the time of jury selection on May 8, 2017, the Commonwealth filed a Motion in Limine to introduce screenshots of certain pages of a Facebook account for "Tyler Mangel," consisting of undated online and mobile device "chat" messages. See Motion in Limine , 5/8/17, at Appendices A-C. The Commonwealth also sought to introduce a Facebook screenshot wherein a photograph of purportedly bloody hands had been posted by "Justin Jay Sprejum Hunt." See id.
On May 8, 2017, the trial court conducted a hearing on the Motion, at which the Commonwealth presented the testimony of Erie County Detective Anne Styn ("Detective Styn"), whom the trial court qualified as an expert in computer forensics. N.T., 5/8/17, at 7. Detective Styn testified that she had received a request from the Commonwealth to determine the owner of a particular Facebook account, bearing the name "Tyler Mangel," and was provided with "Facebook screenshots captured from online, as well as mobile device chats" of that account taken by Trooper Schaeffer[2] of the Pennsylvania State Police. Id. at 7-8, 12-14.
Detective Styn then "conducted a search on Facebook for the individual's name, Tyler Mangel, in which only one name had populated at that time [as] being [']Tyler Mangel.[']" N.T., 5/8/17, at 9. Detective Styn then compared the Facebook account that she had located to the screenshots that she had received from the Commonwealth, and noticed that both the screenshots and the Facebook account bore name "Tyler Mangel;" both listed the account holder as living in Meadville, Pennsylvania; and some of the photographs on the screenshots were the same as those on the Facebook account. Id. at 9. In the "about" section of the Facebook account located by Detective Styn, the page indicated that the individual had attended Meadville High School. Id. Detective Styn further testified that the username associated with the Facebook account was "Mangel17." Id. at 11. Upon receiving the requested subscriber records from Facebook, Detective Styn determined that the account was created by using the first name "Tyler" and the last name "Mangel," and the registered email addresses of mangel17@facebook and tylertkm@hotmail.com. Id. The Facebook subscriber records also indicated that the Facebook account had been verified by the cell phone number (814) 573-4409. Id. at 11-12. Detective Styn then obtained a court order for the Verizon subscriber records associated with this phone number, which identifed the owner of the number as "Stacy Mangel," residing at 10866 Pettis Road, Meadville, Pennsylvania. Id. at 12. The trial court took judicial notice of the fact that this particular address is the same as the address listed in the Criminal Complaint filed against Mangel. Id.
Detective Styn then compared the Facebook account that she had located to the screenshots provided to her by the Commonwealth, and came to the conclusion that the Facebook account that she had located "should be the same" as the account in the screenshots provided by the Commonwealth because both accounts (1)
*1157 bore the name "Tyler Mangel;" (2) listed the account holder as living in Meadville, Pennsylvania; (3) listed the account holder as having attended Meadville High School; and (4) displayed several photographs which seemed to be of the same individual. Id. at 14. With regard to the screenshots of the mobile device chats that the Commonwealth initially provided to Detective Styn, she testified that "[t]he Facebook name itself ... and even the images on his Facebook page" added to her opinion that the chats came from Mangel. Id. at 15. Detective Styn referred to a post by "Tyler Mangel," in the screenshots provided by the Commonwealth, stating "[i]f all that you leave is a scratch you know you're a bitch[,]" and opined that "it looks like he's posting it in regard to an altercation that may or may not have happened." Id. at 16. When Detective Styn was asked what contextual clues she had found in the chats to indicate that they were from the same Facebook account, the defense objected. Id. After hearing argument from counsel, the trial court questioned Detective Styn, as follows:
The Court: Well, I'm the gatekeeper of admissibility. So[,] I want to know, first of all, can you even testify to a reasonable degree of computer and scientific certainty the answer to that question? I mean, can you do that? And[,] this is a criminal case. This is not probability. This is certainty and you know what that is.
[Detective] Styn: Correct.
The Court: So, can you do that, first of all?
[Detective] Styn: Based on my training and experience, in this particular instance I would solely base my testimony off the records that I received from Facebook and Verizon.
The Court: And could you do that with a reasonable degree of certainty that it was what? [ ] Mangel that did all of this?
[Detective] Styn: That this account was registered under Tyler Mangel's account and-
The Court: No. That [ ] Mangel actually did this. You can do that with a reasonable degree of certainty? You can say that he did this? That no one else intervened or someone else grabbed the account? You can do that?
[Detective] Styn: I cannot, Judge.
The Court: So, objection sustained.
Id. at 20. On cross-examination, Detective Styn testified that she did not obtain an IP address for the Facebook account she had located.[3] Id. at 23. Defense counsel then showed Detective Styn his own cell phone, on which he had conducted a Facebook search for "Tyler Mangel," resulting in five accounts bearing that name, one of which listed Meadville, Pennsylvania, as the hometown. Id. at 24. Defense counsel took a screenshot of his Facebook search, which was admitted as an exhibit into evidence for the hearing. Additionally, the trial court admitted into evidence the screenshots taken by Detective Styn of the homepage and "about" page of the Facebook account she had located for "Tyler Mangel;" the Facebook and Verizon subscriber records; and the screenshots provided by the Commonwealth to Detective Styn of the online and mobile device chats on the Facebook account for "Tyler Mangel" located by Trooper Schaeffer. Id. at 21. At the conclusion of the hearing, the trial court denied the Commonwealth's Motion in Limine.
*1158 On May 9, 2017, the Commonwealth timely filed a joint Notice of Appeal, pursuant to Pa.R.A.P. 311(d), claiming that the trial court's Order denying its Motion in Limine terminated or substantially handicapped the prosecution of its criminal cases against Mangel and Craft. The Commonwealth thereafter filed a joint court-ordered Pa.R.A.P. 1925(b) Concise Statement of matters complained of on appeal.[4]
On appeal, the Commonwealth raises the following issues for our review:
1. Did the trial court commit legal error when it applied a "reasonable degree of scientific certainty" standard in determining whether [the Commonwealth] provided adequate extrinsic evidence to support the authenticity of Facebook records?
2. Did the trial court commit legal error when it failed to apply "whether the jury could reasonably find the authenticity of the Facebook records by a preponderance of the evidence" standard in determining whether [the Commonwealth] provided adequate extrinsic evidence to support the authenticity of the Facebook records?
Brief for the Commonwealth at 3 (capitalization omitted).[5]
The Commonwealth claims that the trial court erred by applying "a reasonable degree of certainty, reliability, scientific, technological certainty" standard in determining whether the Commonwealth had satisfied the requirements for authentication of the proffered Facebook records. Id. at 11. The Commonwealth argues that "this ruling was made by the trial court solely based upon the direct testimony of Detective Styn." Id. The Commonwealth contends that "[w]hat evidence the [Commonwealth] may or may not have connecting [Mangel and Craft] to the crimes charged here has no bearing upon the standard to be applied in determining whether the Facebook documents were authenticated." Id. The Commonwealth asserts that the trial court "applied a considerably higher burden than [is] required by either the rules of evidence or controlling case law." Id. The Commonwealth claims that this case is analogous to United States v. Browne , 834 F.3d 403 (3d Cir. 2016), wherein the United States Court of Appeals for the Third Circuit examined the issue of the authentication of social media evidence, and applied a "preponderance of the evidence" standard for authentication of Facebook records. Commonwealth's Brief at 10.
Our standard of review of a denial of a motion in limine is as follows:
When ruling on a trial court's decision to grant or deny a motion in limine , we apply an evidentiary abuse of discretion standard of review. The admission of evidence is committed to the sound discretion of the trial court, and a trial court's ruling regarding the admission of evidence will not be disturbed on appeal unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous.
Commonwealth v. Moser , 999 A.2d 602, 605 (Pa. Super. 2010) (citation omitted).
Pursuant to Pennsylvania Rule of Evidence 901, authentication is required *1159 prior to admission of evidence. The proponent of the evidence must introduce sufficient evidence that the matter is what it purports to be. See Pa.R.E. 901(a). Testimony of a witness with personal knowledge that a matter is what it is claimed to be can be sufficient. See Pa.R.E. 901(b)(1). Evidence that cannot be authenticated by a knowledgeable person, pursuant to subsection (b)(1), may be authenticated by other parts of subsection (b), including circumstantial evidence pursuant to subsection (b)(4).[6] See Pa.R.E. 901(b)(4).
The question of what proof is necessary to authenticate social media evidence, such as Facebook postings and communications, appears to be an issue of first impression in Pennsylvania. Facebook is a social networking site where "[u]sers of that Web site may post items on their Facebook page that are accessible to other users, including Facebook 'friends' who are notified when new content is posted." Nicolaou v. Martin , 153 A.3d 383, 387 n.2 (Pa. Super. 2016) (en banc ) (citing Elonis v. United States , --- U.S. ----, 135 S.Ct. 2001, 2004, 192 L.Ed.2d 1 (2015) ). Additionally, Facebook "requires users to provide a name and e[-]mail address to establish an account. Account holders can, among other things, add other users to their "friends" list and communicate with them through Facebook chats, or messages." Browne , 834 F.3d at 405. In determining what is required to authenticate social media evidence, such as Facebook postings and communications, we look first to the treatment accorded other types of electronic communications.
Pennsylvania appellate courts have considered the authentication of computerized instant messages and cell phone text messages. See In the Interest of F.P., a Minor , 878 A.2d 91, 96 (Pa. Super. 2005) (computerized instant messages); Commonwealth v. Koch , 39 A.3d 996, 1005 (Pa. Super. 2011), affirmed by an equally divided court , 630 Pa. 374, 106 A.3d 705 (2014) (cell phone text messages).[7] In In re F.P. , this Court examined the issue of whether computerized instant message transcripts had been appropriately authenticated. The Commonwealth sought to introduce instant messages from screen name "Icp4Life30" to "WHITEBOY Z." In re F.P. , 878 A.2d at 94. The victim identified himself as "WHITEBOY Z" and testified (1) that he thought "Icp4Life30" was the defendant; and (2) about the events that had occurred involving defendant. Id. The defendant had threatened the victim via instant messages, and when this was reported to the school counselor, there was a meeting between defendant and school officials. Id. A mediation between both students was conducted by a school guidance counselor. Id. The contents of the instant messages referred to these ongoing events and, in one instance, the defendant referred to himself by his first name. Id. The defendant never denied sending the instant messages. Id. The In re F.P. Court concluded that this circumstantial evidence sufficiently identified defendant as "Icp4Life30," and authenticated the instant *1160 message transcripts, such that the trial court did not abuse its discretion in admitting them. Id. at 95.
Notably, the In re F.P. Court rejected the argument that electronic communications, such as text messages or e-mails, are inherently unreliable due to their relative anonymity and the difficulty connecting them to their author, noting that the same uncertainties exist with written documents: "[a] signature can be forged; a letter can be typed on another's typewriter; distinct letterhead stationary can be copied or stolen." In re F.P. , 878 A.2d at 95. The In re F.P. Court also rejected the notion that unique rules for admissibility of electronic communications should be created, stating "[w]e believe that e-mail messages and similar forms of electronic communication can be properly authenticated within the existing framework of Pa.R.E. 901 and Pennsylvania case law[,]" Id. Additionally, the In re F.P . Court concluded that the admissibility of an electronic communication is to be evaluated on a case-by-case basis, as any other document, to determine whether or not there has been an adequate foundational showing of its relevance and authenticity. See id. at 96.
In Koch , this Court examined whether cell phone text messages had been appropriately authenticated prior to their admission into evidence. In that case, the Commonwealth sought the admission of text messages retrieved from a cell phone taken during the execution of a search warrant on the defendant's residence. Koch , 39 A.3d at 1000. During the raid, police found two cell phones, marijuana, scales, a bong, pipes for smoking marijuana, and other drug paraphernalia. Id. The defendant admitted to owning one of the cell phones. Id. Thirteen text messages were retrieved from the defendant's cell phone, the content of which indicated drug sale activity. Id. At trial, a detective testified that he had transcribed the text messages and identifying information from the cellular phone belonging to the defendant. Id. However, the detective conceded that he could not confirm that the defendant was the author of the text messages, and that it was apparent that the defendant did not write some of the messages. Id. at 1003.
The Koch Court looked to this Court's prior holding in In re F.P. , as well as cases from other jurisdictions wherein courts had examined the authentication of text messages, and concluded that "[i]mplicit in these decisions is the realization that e-mails and text messages are documents and subject to the same requirements for authenticity as non-electronic documents generally. Koch , 39 A.3d at 1004 (citations omitted). The Koch Court additionally observed that "electronic writings typically show their source, so they can be authenticated by contents in the same way that a communication by postal mail can be authenticated." Id. at 1003.
However, the Koch Court was mindful of the various challenges presented in authenticating electronic communications:
[T]he difficulty that frequently arises in e-mail and text message cases is establishing authorship. Often more than one person uses an e-mail address and accounts can be accessed without permission. In the majority of courts to have considered the question, the mere fact that an e-mail bears a particular e-mail address is inadequate to authenticate the identity of the author; typically, courts demand additional evidence.
Id. at 1004.[8] Accordingly, the Koch Court ruled, "authentication of electronic communications, *1161 like documents, requires more than mere confirmation that the number or address belonged to a particular person. Circumstantial evidence, which tends to corroborate the identity of the sender, is required." Id. at 1005.
Applying these considerations to the evidence in the record, the Koch Court concluded that the testimony of the detective was insufficient to authenticate the text messages in question, noting that there was no testimony from any person who had sent or received the text messages, nor any contextual clues in the drug-related text messages that tended to reveal the identity of the sender. Id. at 1005. On this basis, the Koch Court concluded that the admission of the text messages constituted an abuse of discretion. Id.[9]
Recently, in Browne , the United States Court of Appeals for the Third Circuit addressed the authentication of Facebook chat logs, and concluded that "it is no less proper to consider a wide range of evidence for the authentication of social media records than it is for more traditional documentary evidence[,]" and that "the Rules of Evidence provide the courts with the appropriate framework within which to conduct that analysis." Browne , 834 F.3d at 412. In Browne , under the Facebook account name "Billy Button," Browne began exchanging messages with one of his female victims, with whom he eventually met in person and exchanged sexually explicit photographs through Facebook chats. Id. at 405. Browne then threatened to publish her photos online unless she engaged in oral sex, and promised to delete the photos only if she provided him with the password to her Facebook account. Id. Using the first victim's Facebook account, Browne made contact with four of her Facebook "friends," all minors, and solicited explicit photographs from them. Id. Once he had the minor's photos, Browne repeated the pattern he had established with his first victim. Id. Browne threatened the minors with public exposure of their images unless they agreed to engage in various sexual acts, and sent additional explicit photos of themselves to his "Billy Button" Facebook account or to his "998" cell phone number. Id. at 405-06. At trial, the district court permitted the government to introduce five Facebook chat logs and a certificate of authenticity into evidence at trial. Id. at 406. Four of the chat logs involved communications between the "Billy Button" Facebook account and four of the five victims. Id. The fifth chat log involved Facebook communications between two of the victims, in which one victim discussed her sexual assault by Browne. Id.
In concluding that the Facebook records were properly authenticated under F.R.E. 901,[10] the Browne Court looked to the following factors: (1) the victims provided detailed testimony about the Facebook communications they had with "Button," which were consistent with the content of the chat logs that the government had introduced into evidence; (2) three of the victims testified that after conversing with the defendant's "Billy Button" Facebook account, they met in person with "Button," whom they were able to identify in open *1162 court as Browne; (3) Browne testified that he owned the "Billy Button" Facebook account on which the search warrant had been executed, and that he had conversed on that account with three of the victims; (4) Browne testified that he owned the phone with the "998" number that was seized from his residence and from which certain images were recovered-which the victims identified as those they sent in response to commands from the "Billy Button" Facebook account or the "998" number; (5) in his post-arrest statement, Browne provided the passwords to the "Billy Button" Facebook account; (6) the personal information that Browne confirmed on the stand was consistent with the personal details that "Button" interspersed throughout his Facebook conversations with certain of the victims (i.e. , that his first name was "Tony," he resided at Lovenlund, was a plumber and had a fiancé); and (7) the government supported the accuracy of the chat logs by obtaining them directly from Facebook and introducing a certificate attesting to their maintenance by the company's automated systems. Browne , 834 F.3d at 413-14. Based on this evidence, the Browne Court ruled that the government had provided sufficient evidence from which the jury could reasonably find the authenticity of the records by a preponderance of the evidence. Id. at 413.
In our view, the same authorship concerns, as expressed by the Koch Court in relation to e-mails and instant messages, exist in reference to Facebook and other social media platforms, that can be accessed from any computer or smart phone with the appropriate user identification and password. See Koch , 39 A.3d at 1004 ; see also In re F.P. , 878 A.2d at 95 (stating that "anybody with the right password can gain access to another's email account and send a message ostensibly from that person."). Social media evidence presents additional challenges because of the great ease with which a social media account may be falsified, or a legitimate account may be accessed by an imposter. See Browne , 834 F.3d at 412. Nevertheless, social media records and communications can be properly authenticated within the existing framework of Pa.R.E. 901 and Pennsylvania case law, similar to the manner in which text messages and instant messages can be authenticated. Initially, authentication social media evidence is to be evaluated on a case-by-case basis to determine whether or not there has been an adequate foundational showing of its relevance and authenticity. See In re F.P. , 878 A.2d at 96. Additionally, the proponent of social media evidence must present direct or circumstantial evidence that tends to corroborate the identity of the author of the communication in question, such as testimony from the person who sent or received the communication, or contextual clues in the communication tending to reveal the identity of the sender. See Koch , 39 A.3d at 1005. Other courts examining the authentication of social media records have ruled that the mere fact that an electronic communication, on its face, purports to originate from a certain person's social networking account is generally insufficient, standing alone, to authenticate that person as the author of the communication. See United States v. Vayner , 769 F.3d 125, 131 (2d Cir. 2014) (holding that the government failed to authenticate what it alleged was a printout of the defendant's profile page from a Russian social networking site where it offered no evidence to show that the defendant had created the page); United States v. Jackson , 208 F.3d 633, 636-37 (7th Cir. 2000) (holding that in order to authenticate a website posting, the proponent had to show that the group in question had actually authored the post, rather than merely someone improperly accessing the group's website);
*1163 Griffin v. State , 419 Md. 343, 19 A.3d 415, 423-24 (2011) (holding that MySpace account profile bearing a photograph of an individual, coupled with her location and birthdate, were insufficient to authenticate a posting from the account, as having been made by the individual); Commonwealth v. Purdy , 459 Mass. 442, 945 N.E.2d 372, 381 (2011) (explaining that an e-mail sent from a Facebook account bearing the defendant's name was not sufficiently authenticated without additional confirming circumstances); Smith v. State , 136 So.3d 424, 434 (Miss. 2014) (holding that the name and photo on a Facebook printout were not sufficient to link the communication to the alleged author, where the state failed to make a prima facie case that the messages were actually sent by the defendant); Dering v. State , 465 S.W.3d 668, 672 (Tex. 2015) (holding that Facebook posts on a third party's account by other third parties were not authenticated, where the sponsoring witness was neither the owner of the account onto which the posts were made, nor the owner of any of the accounts of the alleged posters).
Turning to the record before us, the trial court, in reliance upon Koch , explained that it had denied the Commonwealth's Motion in Limine on the basis that it had failed to present sufficient evidence that tended to corroborate that Mangel was the sender of the Facebook communications in question. See Trial Court Opinion, 7/10/17, at 9. As explained by the trial court,
... Mangel did not himself state at any time that the Facebook account in question was his own personal Facebook account and/or that he authored the posts and messages on the Facebook account, and the Commonwealth did not introduce subsequent testimony from any other knowledgeable party to substantiate that the Facebook page (and, by association, the posts and messages contained therein) belonged to [ ] Mangel. Moreover, the Commonwealth did not obtain the username or password for the Facebook account to confirm its authenticity. Although the Commonwealth did produce evidence allegedly linking [ ] Mangel to the Facebook page in question, including a name, hometown, school district and certain pictures, this information has generally been held to be insufficient to connect a defendant to posts and messages authored on a Facebook page. In fact, following a search on Facebook for the name of "Tyler Mangel" by [defense counsel], five (5) "Tyler Mangel" Facebook accounts appeared in response to the search, one of which has the same hometown of "Meadeville, Pennsylvania," which contradicts Detective Styn's testimony that only one (1) "Tyler Mangel" Facebook account appeared during her search.
A thorough review of the Facebook posts and messages themselves raises specific issues. First, the evidence presented by the Commonwealth does not indicate the exact time the posts and messages were made. The incident which brought about the instant criminal charges occurred allegedly on June 26th, 2016, according to the Criminal Information. The lack of a date and timestamps raises a significant question regarding the connection of the posts and messages to the alleged incident on June 26th, 2016. Furthermore, the "Tyler Mangel" who allegedly authored the Facebook posts and messages does not specifically reference himself in the incident on June 26th, 2016; rather, other individuals, many of them who are not directly involved in the instant criminal case, reference a "Tyler Mangel" in response to a post made and in subsequent conversations about an alleged assault. Moreover, the Facebook posts and messages are very ambiguous, containing slang and other nonsensical words with "Like" replies, and do not specifically *1164 and directly relate to the alleged incident on June 26th, 2016. Finally, the Commonwealth did not produce evidence as to the distinct characteristics of the posts and messages which would indicate [that] Mangel was the author.
Also, as part of the Commonwealth's Exhibit 2, the Commonwealth introduced a black and white copy of a Facebook picture of a hand, which is allegedly bloody and bruised. However, this picture was posted by a Facebook user named "Justin Jay Sprejum Hunt," who makes no reference to [ ] Mangel or Craft. Therefore, this Facebook exhibit offered by the Commonwealth is not relevant regarding the authentication of the Facebook posts and messages.
Trial Court Opinion, 7/10/17, at 9-10 (internal citations and footnote omitted).[11]
Based on its explanation, it is clear that the trial court, in recognizing Koch as the controlling legal precedent in Pennsylvania for the authentication of electronic communications, applied the proper standard in determining whether the Commonwealth had presented sufficient direct or circumstantial evidence that Mangel had authored the Facebook messages in question.[12] Here, the Commonwealth presented no evidence, direct or circumstantial, tending to substantiate that Mangel created the Facebook account in question, authored the chat messages, or posted the photograph of bloody hands. The mere fact that the Facebook account in question bore Mangel's name, hometown and high school was insufficient to authenticate the online and mobile device chat messages as having been authored by Mangel. Moreover, there were no contextual clues in the chat messages that identified Mangel as the sender of the messages. Accordingly, the trial court did not abuse its discretion in denying the Commonwealth's Motion in Limine to admit such items into evidence at trial.
Order affirmed.

The Affidavit of Probable Cause attached to each Criminal Complaint was the same, except for the docket number, OTN number and the defendant's name.

Trooper Schaeffer's first name is not contained within the record.

Notably, Detective Styn had testified that an investigation of social media includes retrieving IP addresses to determine the specific location from which an item has been posted, including the specific computer or network where a particular post originated from. See N.T., 5/8/17, at 5-6, 23.

This Court, sua sponte , consolidated the appeals.

Although the Commonwealth purports to raise two issues on appeal, the Argument section of its brief contains only one section. See Pa.R.A.P. 2119(a) (providing that "[t]he argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part-in distinctive type or in type distinctively displayed-the particular point treated therein."). Nevertheless, as the Commonwealth's issues are related, we will address them together.

Pursuant to Rule 901(b)(4), evidence may be authenticated by "Distinctive Characteristics and the Like. The appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." Pa.R.E. 901(b)(4).

Because an equally divided Supreme Court affirmed this Court's grant of a new trial in Koch , our Supreme Court's decision is not binding in this case. See Commonwealth v. Mosley , 114 A.3d 1072, 1082 n.11 (Pa. Super. 2015) (holding that "[w]hen a judgment of sentence is affirmed by an equally divided court, as in the Koch case, no precedent is established and the holding is not binding on other cases.") (citation omitted).

In In re F.P . , the Court noted that "[t]here is a paucity of cases involving authentication of e-mails or instant messages, none in the Commonwealth of Pennsylvania." Based on our review, it appears that there have been no further intermediate court developments in the specific area of authentication of social media evidence since the In re F.P. Opinion was published.

Also at issue in Koch was whether the text messages constituted inadmissible hearsay under Pa.R.E. 802. See Koch , 39 A.3d at 1005-06 (holding that there was no exception to the hearsay rule that would render the text messages admissible, and their admission constituted an abuse of discretion). However, the issue of whether the Facebook communications in question constitute hearsay is not before us in this case.

Pa.R.E. 901 is substantially identical to F.R.E. 901. See Pa.R.E. 901, cmt. Relevant to this analysis, Pa.R.E. 901(b)(4) is identical to F.R.E. 901(b)(4). See id.

We further observe that the Commonwealth did not produce any evidence that Mangel had created, or had access to, the email accounts associated with the Facebook account (mangel17@facebook and tylertkm@hotmail.com), per the Facebook subscriber records. Nor did the Commonwealth produce any evidence that Mangel had access the cellular phone with the number (814) 573-4409, associated with the Facebook account, or any relationship with the individual who owned that number ("Stacy Mangel").

The Commonwealth appears to conflate the authentication of evidence standard applied by the trial court, with the expert testimonial standard employed during the trial court's questioning of Detective Styn. As Detective Styn had been qualified as an expert, the trial court properly inquired whether she could state her opinions with a reasonable degree of certainty. See Commonwealth v. Gonzalez , 109 A.3d 711, 727 (Pa. Super. 2015) (holding that an expert must base her opinion on a reasonable degree of certainty instead of mere speculation).