J-S48034-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MATTHEW WHITE | : | |
| | : | |
| Appellant | : | No. 595 EDA 2019 |

Appeal from the Judgment of Sentence Entered February 7, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0001856-2017,
CP-51-CR-0001857-2017

BEFORE: KUNSELMAN, J., KING, J., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.: **FILED: DECEMBER 29, 2020**

Matthew White (Appellant) appeals from the judgment of sentence entered in the Philadelphia County Court of Common Pleas, following his jury convictions, at trial docket CP-51-CR-0001856-2017 (Case 1856), of aggravated assault, robbery,[1] and related offenses. He avers the trial court erred in: (1) consolidating two dockets for trial; (2) admitting Facebook photos

---

[1] 18 Pa.C.S. § 2702(a), 3701(a)(1)(iv). As we discuss *infra*, Appellant was also convicted of second-degree murder, 18 Pa.C.S. § 2502(b), and related offenses at trial docket CP-51-CR-0001857-2017 (Case 1857). He took an appeal in that case, which was docketed in this Court at 594 EDA 2019. However, that appeal was dismissed on June 19, 2019, for failure to file a brief.

and telephone records, on the grounds they were not authenticated; and (3) failing to dismiss the charges due to a **Brady**[2] violation. We affirm.

Appellant was charged at Case 1856 and Case 1857 for separate offenses committed on consecutive nights. Over Appellant's objection, the trial court granted the Commonwealth's motion to consolidate the two cases for trial.[3] The trial court has noted this case has a "complex procedural history[, including] one change of trial counsel, three changes in prosecutors, and five trial date continuances, borne primarily by the Commonwealth's inability to provide discovery in a timely manner." Trial Ct. Op. at 1 n.1. During or shortly after jury selection, on August 1, 2018, the Commonwealth provided additional discovery — a photo array (discussed **infra**). On August 3rd, the trial court conducted a hearing, found the evidence was **Brady** material, and continued trial so that Appellant "could review the material in question and be afforded a fair trial." **Id.** at 15-16. The presentation of evidence commenced almost six months later, around January 28, 2019.

The trial court aptly summarized the evidence for Case 1856:

> On January 7, 2017, [Appellant] contacted transgender sex worker Ramiro Alejandro "Aly" Damian-Lopez via an

---

[2] **Brady v. Maryland**, 373 U.S. 83 (1963).

[3] The trial court's opinion states it granted consolidation on March 9, 2018, the day after the Commonwealth filed a motion for same and Appellant filed a response. **See** Trial Ct. Op., 4/12/19, at 1; Trial Docket, at 15 (unpaginated). However, we note, there is no corresponding entry on the trial docket.

advertisement placed on backpage.com. After exchanging a series of text messages, [Appellant] arranged to meet at Damian-Lopez's home at 1309 North 52nd Street in West Philadelphia, as he had done more than five times in the past. Upon arriving . . . , [Appellant] sought to speak with Damian-Lopez instead of purchasing her services, and upon discovering that [Appellant] did not have money, Damian-Lopez asked him to leave. [N.T., 1/29/19, at 216-22.]

At approximately 10:00 p.m. on January 8, 2017, Damian-Lopez and transgender housemates Miayanna Brooks and Saleem Singleton, who also performed sex work, were watching a movie in Damian-Lopez's bedroom. . . . Singleton went to the kitchen and [saw Appellant outside the window,] trying to get Singleton's attention . . . . [N.T., 1/29/19, at 11-12, 83-90, 222-23.]

After [Appellant] mentioned Damian-Lopez's name, Singleton opened the front door and asked him whether Damian-Lopez knew he was there. Without answering, [Appellant] pushed Singleton into the kitchen, pressed a 9mm pistol against Singleton's ribs, and warned, "Don't fucking scream." [Appellant] forced Singleton into Singleton's bedroom and demanded money. There, he stole $70 from the dresser and a cell phone from Singleton's purse. Then, [Appellant] pointed his gun to the back of Singleton's head and forced Singleton to escort him to Damian-Lopez's bedroom. [N.T., 1/29/19, at 91-101.]

At [Appellant's] behest, Singleton knocked on Damian-Lopez's door and asked her to slide approximately $40 under the door. As Damian-Lopez attempted to retrieve the money, [Appellant] forced open the door and pushed Singleton into the room. Holding Brooks, Singleton, and Damian-Lopez at gunpoint, [Appellant] demanded money, cell phones, and marijuana. As Damian-Lopez, who recognized [Appellant] as a previous customer, searched for money, [Appellant] forced Brooks and Singleton to sit on the ground and stole two cell phones from the bed and approximately $300-$400 from Damian-Lopez. Using his gun to direct them, [Appellant] forced Brooks, Singleton, and Damian-Lopez to crawl back into the kitchen, where he told them that they were "too pretty to kill" and exited through the front door. [N.T. 1/29/19, at 16-20, 100-13, 222-32.]

Brooks chased after [Appellant] to the parking lot outside the JSSK Laundromat across the road at 1300 North 52nd Street,

where Brooks yelled, "You fucking pussy." Upon hearing this, [Appellant] turned around and fired at Brooks, but missed. This encounter was captured by the laundromat's security cameras. [N.T., 1/29/19, at 19 -20; Commonwealth Exh. C-9.]

[Brooks contacted police, who responded to the scene. The complainants described Appellant] as a black male, approximately twenty-six years old, wearing all black clothing, brandishing a silver and black semiautomatic pistol, and having a teardrop tattoo on his face. . . . The next day Detective Michael Kimmel recovered video surveillance footage from the JSSK Laundromat and one fired cartridge casing . . . from the crime scene. The surveillance footage showed [Appellant] shoot at Brooks before running in the direction of the camera, passing close enough to permit witnesses to provide a positive identification from the video. [N.T., 1/29/19, at 307-21; N.T., 1/30/19, at 197-221, 258-73.]

Trial Ct. Op., at 3-5.

The trial court also summarized the trial evidence for Case 1857:

At approximately 9:30 p.m. on January 9, 2017, [Appellant] arranged to purchase the services of transgender sex worker Vivian Royster via an advertisement on [b]ackpage.com[. He arranged to meet her] at 5406 West Girard Avenue, which Royster shared with [her paramour, Barry Jones (the decedent), and her aunt, Betty Jones (unrelated).] When [Appellant] arrived, Royster . . . recognized [him] as a previous client[. N.T., 1/30/19, at 5-7, 13, 36-37].

In the bedroom, Royster asked for payment[. Appellant] drew a silver and black semi-automatic pistol, pointed it at Royster, and said "You know what this is." Upon Royster screaming and informing him that there was no money[, Appellant] ransack[ed] the room, taking $30 and a cell phone from a dresser. [N.T., 1/30/19, at 15-22.]

During the commotion, the decedent burst into the room and began struggling on the bed with [Appellant] for the gun. During the fight, [Appellant] pushed the decedent off the bed, aimed his weapon and shot the decedent in the face twice. [Appellant] also aimed his weapon at Royster and fired one shot and missed. [Appellant] immediately ran down the steps, followed by Royster,

- 4 -

where he turned around, fired once, and grazed Royster in the shoulder before absconding. Betty Jones called 911[. N.T. 1/31/19, at 23-34.]

Trial Ct. Op. at 5-6. The decedent was pronounced dead that night. *Id.* at 6.

Royster was friends with Damian-Lopez and Singleton, the victims in the prior night's robbery. N.T. Trial, 1/29/19, at 250; N.T. Trial, 1/30/19, at 45.

The trial court summarized the police investigation of the two incidents:

> After midnight on January 10, 2017, Royster [reviewed the laundromat surveillance video and] identified the [person] on [the] video as the same individual who killed the decedent. Royster was unaware of [the prior night's] incident at the time she made the identification. At approximately 4:00 a.m., Royster travelled to Singleton[ ] and Damian-Lopez's apartment and informed them about the shooting. [N.T., 1/29/19, at 132-37, 241-53; N.T., 1/30/19, at 40-47; Commonwealth Exh. C-39.]
>
> \* \* \*
>
> [Around January 13 or 14, 2017,] Singleton received a "Suggested Friends" Facebook notification[,] which directed [her] to [Appellant's] profile page[,[4] which] contained multiple "selfie" images of him. Having recognized [Appellant's] "selfie" images as depicting the perpetrator of the January 8, 2017 robbery, Singleton took multiple "screenshot" photos of [Appellant's] Facebook profile through the smartphone's camera and provided them to Detective [William] Kelhower. On January 14, 2017, detectives provided Brooks, Singleton, . . . Damian-Lopez[, and Royster] with photo arrays containing [Appellant's] image, and each witness identified [Appellant] as their assailant. [N.T., 1/29/19, at 20-34, 132-46; Commonwealth Exhs. C-10, C-16, C-18, C-89, C-90, C-91.]

---

[4] Here, the trial court opinion states the Facebook profile "was listed under [Appellant's] name." Trial Ct. Op. at 7. However, as we discuss *infra*, the Commonwealth's exhibits show a profile name of "Hamzah Allah's Lion." Commonwealth Exh. 11.

- 5 -

Philadelphia Police officers arrested [Appellant] the next day. [I]nvestigators searched [Appellant's] cell phone, numbered (215) 416-5660, and discovered [he] employed an application called "Sideline," which allowed him to spoof a different number[, (610)589-0673,] for caller identification purposes[. Investigators also] discovered that [Appellant's] phone, via Sideline, employed the (610)589-0673 number to call Damian-Lopez's and Royster's phones before both the robbery and the murder. Investigation of [Appellant's] internet search history revealed approximately 44 individual searches for pornographic videos depicting transgender participants between December 24 and December 25, 2016. [Appellant] further accessed advertisements for transgender sex workers via backpage.com . . . on December 29, 2016 and at 1:15 a.m. on January 14, 2017. Approximately one hour after the January 14, 2017 search, [Appellant] accessed two news articles covering the January 9, 2017 homicide. [Appellant] also searched for 9mm magazines use[d] to hold the same type of ammunition used in each incident. [N.T., 1/31/19, at 297-331.]

Detective James Dunlap, an expert in cell tower analysis, reviewed the phone records for [Appellant's] (215) 416-5660 phone number and discovered that at 9:46 and 9:56 p.m. on January 9, 2017, that phone was used to make two outgoing calls from the cell tower nearest to 5406 West Girard Avenue. [N.T. 2/4/19 at 126-30.]

. . . Ballistics testing revealed that the recovered [fired cartridge casings] from both 1309 North 52nd Street and 5406 West Girard Avenue were all fired from the same weapon . . . . Police officers recovered the murder weapon on September 11, 2017. . . . [N.T., 1/31/19, at 67-70, 89-90, 101-20.]

Trial Ct. Op. at 6-8.

The jury returned a verdict on February 7, 2019. At Case 1856, the jury

found Appellant guilty of three counts of robbery[5] and one count each of

_____

[5] 18 Pa.C.S. § 3701(a)(1)(iv).

possessing instruments of crime (PIC), aggravated assault, burglary, and firearms not to be carried without a license[6] (VUFA 6106). At Case 1857, the jury found Appellant guilty of second-degree murder, attempted murder, PIC, aggravated assault, VUFA 6106, and two counts of robbery. Immediately following the verdict, the trial court imposed an aggregate sentence of life imprisonment without parole.

Appellant's counsel filed a timely post-sentence motion, along with a motion to withdraw as counsel. On February 13, 2019, the trial court denied the post-sentence motion but permitted counsel to withdraw, and directed that appeal counsel be appointed. The following day, before counsel was appointed, Appellant filed a *pro se* notice of appeal at Case 1856. That appeal is docketed in this Court at the present case, 595 EDA 2019. New counsel was appointed on February 19th, and yet another substitute attorney was subsequently appointed.

At this juncture we note Appellant also filed a notice of appeal at Case 1857.[7] Trial Ct. Op. at 2 n.4. That appeal was docketed in this Court at 594

_____

[6] 18 Pa.C.S. §§ 907(a), 2702(a), 3502(a)(1), 6106(a)(1). "At trial, the Commonwealth presented a Certificate of Non-Licensure showing that [Appellant] was not licensed to carry a firearm." Trial Ct. Op. at 9. Appellant was also charged with the attempted murder, 18 Pa.C.S. § 901, of Brooks, and was found not guilty.

[7] While the record for Case 1857 is not presently before us, the trial court states: "This Court's Office of Judicial [R]ecords confirmed that [Appellant's]

EDA 2019, but was dismissed on June 19, 2019, for failure to file a brief. *Commonwealth v. White*, 594 EDA 2019, Order, June 19, 2019. Appellant did not seek relief from that dismissal. Thus, only the appeal from Case 1856 is presently before us. Although, as we discuss *infra*, the evidentiary rulings and Appellant's appellate issues pertain to both trial dockets, this panel only has jurisdiction to grant relief, if any, at Case 1856.

Appellant raises the following four issues for our review:

I. Did the lower court err in granting the Commonwealth's Motion for Consolidation where evidence of the murder in question would not have been admissible in a separate trial for the robbery of Miayanna Brooks, Saleem Singleton, and Aly Damien and was not capable of separation by the jury?

II. Did the lower court err in admitting alleged Facebook photos of [Appellant] that had not been properly authenticated?

_____

*pro se* Notice of Appeal was filed separately for each docket." Trial Ct. Op. at 2 n.4.

We further note that at the instant docket, for Case 1856, this Court issued a per curiam order on January 29, 2020, directing Appellant to show cause why this appeal should not be quashed pursuant to *Commonwealth v. Walker*, 185 A.3d 969 (Pa. 2018). *See id.* 185 A.3d at 977 (appellant must file separate notices of appeal "when a single order resolves issues arising on more than one lower court docket," and failure to do so will result in quashal of appeal). Appellant filed a response, and this Court vacated the show cause order, but advised the issue would be referred to the merits panel. Order, 4/2/20.

Upon review, we observe Appellant's February 14, 2019, *pro se* notice of appeal lists the docket numbers for both Case 1856 and 1857. We conclude this filing satisfies *Walker*, for purposes of the Case 1856/595 EDA 2019 appeal. *See Commonwealth v. Johnson*, 236 A.3d 1141, 1148 (Pa. Super. 2020) (*en banc*) (a notice of appeal, for one trial docket, does not violate *Walker* if it also lists other trial dockets numbers).

- 8 -

III. Did the lower court err in admitting phone records where the Commonwealth failed to authenticate the records via a qualified records custodian?

IV. Did the lower court err in failing to dismiss the charges against [Appellant] in light of the Commonwealth's failure to timely disclose **Brady** material?

Appellant's Brief at 3.

In his first issue, Appellant argues the trial court erred in granting the Commonwealth's motion to consolidate the two cases for trial. He first recounts that the investigation in Case 1856 (the robbery of Damian-Lopez, Brooks, and Singleton) "revealed video and Facebook photos that were . . . used . . . to make identifications" in investigating Case 1857 (the homicide of Jones and robbery of Royster). Appellant's Brief at 17. Appellant concedes that evidence of the first night's "robbery would have been admissible at a separate trial for the homicide case." *Id.* Appellant avers, however, the converse is not true: "The events and investigation of the homicide case . . . in no way lead to the identifications regarding the robbery. As a result, the events of the homicide case would not have been admissible in a separate trial for the robbery." *Id.* We conclude no relief is due.

We note the relevant standard of review:

"Whether or not separate indictments should be consolidated for trial is within the sole discretion of the trial court and such discretion will be reversed only for a manifest abuse of discretion or prejudice and clear injustice to the defendant." Pennsylvania Rule of Criminal Procedure 582 provides that joinder of offenses charged in separate indictments or informations is permitted when "the evidence of each of the offenses would be admissible in a

- 9 -

separate trial for the other and is capable of separation by the jury so that there is no danger of confusion." Pa.R.Crim.P. 582(A)(1)(a). While evidence of other criminal behavior is not admissible to show a defendant's propensity to commit crimes, such evidence "may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident" so long as the "probative value of the evidence outweighs its prejudicial effect." Pa.R.E. 404(b)(2),(3)[.]

*Commonwealth v. Johnson*, 179 A.3d 1105, 1115-16 (Pa. Super. 2018)

(some citations omitted).

Here, the trial court discussed its reasons for granting consolidation:

[T]he evidence presented in each case would be admissible to demonstrate the history and natural development of the facts of the other matter. Each incident occurred in the same geographic area on consecutive days, and targeted tightly knit members of the city's small transgender community. [Appellant] used the same weapon to perpetrate each offense. [Appellant's] *modus operandi* bears a striking similarity for each offense: [he] used a mobile phone application to mimic the same (610) 589-0673 number that he used to contact both Damian-Lopez and Royster, each of whom he had previously hired, in order to gain access to their homes. The video surveillance evidence recovered pursuant to the January 8, 2017 Robbery investigation was shown to Royster, who identified the perpetrator of the Robbery as the decedent's murderer. Singleton's discovery of [a] Facebook profile containing [Appellant's] name and photographs permitted the police to assemble a photo array containing [Appellant's] photo, which Brooks, Singleton, Damian-Lopez, and Royster [used] to identify [Appellant] as the perpetrator of each crime. Upon recovering [Appellant's] phone incident to arrest, investigators obtained data showing [Appellant's] interest in sex acts involving transgender performers and his history of searching for transgender sex workers via backpage.com.[8]

_____

[8] The trial court also found consolidation of the cases would not risk confusing the jury. Trial Ct. Op. at 11. Appellant does not challenge this finding on appeal.

- 10 -

Trial Ct. Op. at 10-11.

Appellant's sole argument on appeal is that the police investigation of the second night's homicide "in no way lead[s] to the identifications regarding the [first night's] robbery." Appellant's Brief at 17. This limited discussion, however, does not address, let alone dispute, the trial court's analysis that evidence relating to each incident would tend to show "motive, opportunity, intent, preparation, plan, knowledge, [or] identity" relevant to the other incident. *See Johnson*, 179 A.3d at 1116. Appellant has not established the trial court's ruling was an abuse of discretion, and we do not disturb its consolidation order.

Appellant's second claim is that the trial court erred in admitting the Facebook photos of him, on the ground they were not properly authenticated. Appellant's Brief at 18. As stated above, Singleton received a "Suggested Friends" notification on Facebook, which directed her to a Facebook profile under Appellant's name and containing multiple photos of Appellant. Trial Ct. Op. at 7. Singleton used her phone to take multiple "screenshots" of this Facebook profile page. *Id.* Appellant filed a motion *in limine* to preclude the screenshots, and the trial court conducted a hearing on July 31, 2018.[9] *See*

---

[9] "Appellant preserved the issue by litigating the pre-trial motion *in limine*, and was not required to object to the trial court's ruling on the motion or place an objection on the record at trial in order to preserve the issue for appeal." *Commonwealth v. Stokes*, 78 A.3d 644, 652 (Pa. Super. 2013), *citing, inter*

N.T. Motion *in Limine*, 7/31/18, at 10-11. Appellant claimed the exhibits should be excluded because they could not be linked to any account made by him: "We don't know if it's a fake account someone [made] and used [Appellant's] picture[.]" N.T. Motion, 7/31/18, at 12. Appellant further alleged it was not established that he was the person depicted in the Facebook photos. The Commonwealth responded that it was irrelevant who made the Facebook account, but instead, "what matters is that" Singleton recognized Appellant in the photos. *Id.* at 13. The Commonwealth further averred that the question — of whether Appellant was the person in the photos — was for the jury to decide. *Id.* at 14. The trial court admitted the photos. *Id.* at 15.

On appeal, the sum of Appellant's argument is that there was no evidence he created the Facebook profile, nor that he "was in fact the person depicted in the photos." Appellant's Brief at 18. Appellant relies on **Commonwealth v. Mangel**, 181 A.3d 1154 (Pa. Super. 2018), which he summarizes as reversing "the admission of social media posts via a computer forensic expert [where] there was no evidence [the] defendant had created the account or sent the communications and photos in question." Appellant's Brief at 18. No relief is due.

We note:

_____

*alia*, Pa.R.E. 103(b) ("Once the court rules [on evidence] definitively on the record — either before or at trial — a party need not renew an objection or offer of proof to preserve a claim of error for appeal.").

- 12 -

When ruling on a trial court's decision to grant or deny a motion *in limine*, we apply an evidentiary abuse of discretion standard of review. The admission of evidence is committed to the sound discretion of the trial court, and a trial court's ruling regarding the admission of evidence will not be disturbed on appeal unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous.

Pursuant to Pennsylvania Rule of Evidence 901, authentication is required prior to admission of evidence. The proponent of the evidence must introduce sufficient evidence that the matter is what it purports to be. *See* Pa.R.E. 901(a). Testimony of a witness with personal knowledge that a matter is what it is claimed to be can be sufficient. *See* Pa.R.E. 901(b)(1). Evidence that cannot be authenticated by a knowledgeable person, pursuant to subsection (b)(1), may be authenticated by other parts of subsection (b), including circumstantial evidence pursuant to subsection (b)(4). *See* Pa.R.E. 901(b)(4).

***Mangel***, 181 A.3d at 1158-59 (some citations and footnote omitted).

In the case *sub judice,* the trial court acknowledged the general "difficulties in properly authenticating evidence obtained through social media accounts." Trial Ct. Op. at 11, *citing* ***Mangel***, 181 A.3d 1154. The court reasoned, however, "the author of the Facebook profile in question was irrelevant:"

Singleton took the [screenshots] and thus had the requisite knowledge to show that the photograph is a fair and accurate representation of the images that appeared on [her] phone's screen at the time. This evidence was not used to prove [Appellant] authored the Facebook profile or curated the photos that appeared within it, rather the evidence was admitted to show the jury the course of investigation which culminated in Brooks, Singleton, Damian-Lopez, and Royster identifying [Appellant] as the perpetrator of each crime via photo array. [Appellant] fails to show that the Commonwealth failed to properly authenticate the photos in question.

Trial Ct. Op. at 11-12.

The Facebook profile-screenshots do not bear Appellant's name, but rather show a profile name of "Hamzah Allah's Lion." Commonwealth Exh. 11. Appellant does **not** argue that someone deceitfully created a social media profile using his name. We agree with the trial court the identity of the person who created the Facebook profile is not relevant; as the trial court simply states, the Commonwealth did not seek "to prove [Appellant] authored the Facebook profile or curated the photos that appeared within it." **See** Trial Ct. Op. at 12. Instead, the evidence was presented to show Singleton saw the photos on her Facebook account, recognized the person in the photos as their assailant, and took and provided screenshots to the police. **Id.**

For these same reasons, we conclude **Mangel**, the case relied upon by Appellant, is distinguishable. In that case, the Commonwealth sought to introduce Facebook posts and messages allegedly made by the defendant. **Mangel**, 181 A.3d at 1155-57. This Court held the evidence was properly excluded, reasoning "the Commonwealth presented no evidence, direct or circumstantial, tending to substantiate that [the defendant] created the Facebook account in question, authored the chat messages, or posted the photograph of bloody hands." **Id.** at 1164. In this case, as stated above, the Commonwealth did not argue Appellant created the Facebook profile or posted the photos to that account. Accordingly, the Commonwealth was not required to authenticate who created the Facebook account.

Appellant's third claim on appeal is that the trial court erred in admitting evidence of his phone records on the ground that they were not authenticated by a qualified records custodian. Appellant's Brief at 19. He summarizes: (1) Detective Kelhower testified about "the subscriber's information pertaining to the phone purportedly connected to" Appellant; (2) Agent Joseph Purfield testified about "the contents of Sideline/Pinger records[,] as well as the call detail records for [Damian-Lopez] and . . . Royster;" (3) and Detective Dunlap testified about "the content of call detail records." *Id.* at 20. Appellant asserts, "The Commonwealth failed to qualify any of these witnesses as a records custodian or to lay any of the requisite foundation . . . for the records' admission under Pa.R.E. 803(6)." *Id.* We conclude these claims are waived.

"We have long held that '[f]ailure to raise a contemporaneous objection to the evidence at trial waives that claim on appeal.'" *Commonwealth v. Tha*, 64 A.3d 704, 713 (Pa. Super. 2013) (citation omitted).

> This [C]ourt cannot review a case upon a theory different from that relied upon in the trial court, or raised for the first time on appeal. A theory of error different from that presented to the trial jurist is waived on appeal, even if both theories support the same basic allegation of error which gives rise to the claim for relief. It is a firm rule in this jurisdiction that if the ground upon which an objection to the admission of evidence is specifically stated, all other reasons for the exclusion of the evidence are waived and may not be raised thereafter.

*Commonwealth v. Mehalic*, 555 A.2d 173, 183 (Pa. Super. 1989) (citations omitted). "Issues not raised in the trial court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). Furthermore, where "an issue

is not reviewable on appeal unless raised or preserved below," the statement of the case and argument sections of an appellant's brief must specify the place in the record where their issue was raised before the trial court. *See* Pa.R.A.P. 2117(c)(1), 2119(e).

Appellant fails to identify the place in the record where he objected to the admission of the phone records on the ground they were not authenticated by a records custodian. *See* Pa.R.A.P. 2117(c)(1), 2119(e). With respect to Detective Kelhower's testimony, Appellant cites page 199 of the January 31, 2019, trial transcript. That portion of the transcript reveals Appellant raised only a hearsay objection. *See* N.T., 1/31/19, at 199. With respect to Agent Purfield's testimony, Appellant raised no objection of any nature during their direct examination. *See id.* at 298-332. During Detective Dunlap's direct examination, Appellant raised several objections, but none related to authenticating the phone records. *See* N.T., 2/4/19, at 80-130. For the foregoing reasons, we conclude the issue is waived for our review.

Furthermore, we agree with the Commonwealth that this issue is waived for Appellant's failure to include it in his court-ordered Pa.R.A.P. 1925(b) statement. Appellant's Rule 1925(b) statement framed a challenge to the phone records-evidence as follows:

> The trial court erred in allowing the Commonwealth to introduce various documentation relating to phone records and evidence obtained through these phone records, from a phone seized from [Appellant]. Further, that certain information pertaining to that which was derived from the cell phone was not provided in a timely fashion to [Appellant] in violation of the appropriate

discovery rule[. N.T., 1/31/19, at 213-16.] As a result thereof [Appellant] should be awarded a new trial.

Appellant's Statement of Matters Complained of Pursuant to Rule of Appellate Procedure 1925(b), 4/8/19, at 1 (unpaginated). This statement makes no reference to authenticating phone records or a records custodian. *See* Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement . . . are waived.").

Appellant's final claim is that the trial court erred in not dismissing the charges, pursuant to *Brady*, due to the Commonwealth's failure to timely disclose evidence of a photo array. Appellant' Brief at 20. We set forth the context:

> On January 12, 2017, [during the investigation of the robberies and homicide,] Damian-Lopez [told] Detective William Kelhower . . . that she observed the perpetrator of the robbery at a grocery store near the intersection of 52nd Street and Girard Avenue. At that location, Detective Kelhower detained Michael Attaway, an individual who fit the perpetrator's description. Detectives prepared a photo array containing Attaway's photo, which was shown to Brooks, Singleton, and Damian-Lopez. Neither [sic] witness identified Attaway or any other individual in the photo array. [N.T., 1/31/19, at 243-56.]

Trial Ct. Op. at 7.

Detective Joseph Murray testified at trial that he presented the January 12, 2017, photo array to Brooks, Singleton, and Damian-Lopez. Trial Ct. Op. at 9. He informed homicide detectives of the result, but failed to provide them with copies of the array. *Id.* Detective Murray "rediscovered the array in April or May of 2018 and provided it to Detective" Jeffrey Gilson, who

investigated this case. *Id.* "The assigned Assistant District Attorney for the July 30, 2018[, hearing] discovered the array's existence on August 1, 2018, and immediately passed the discovery to trial counsel for review." *Id.* At that time, jury selection had already been conducted. *Id.* at 15.

The trial court summarized:

On August 3, 2018, this Court presided over a hearing and concluded that this evidence constituted relevant *Brady* material. This Court further expressed that the Commonwealth's piecemeal passing of discovery deeply concerned this Court. Despite this Court's exasperation over the Commonwealth's handling of discovery in this matter, it ultimately concluded that the proper remedy was to continue the matter so that [Appellant] could review the material in question and be afforded a fair trial. [N.T. 8/3/18 at 152-63.]

Trial Ct. Op. at 15-16 (footnote omitted).

On appeal, the sum of Appellant's argument is:

[A]fter numerous prior continuances due to the late disclosure of discovery, on August 3, 2018, this matter had to be continued in the midst of jury selection due to the Commonwealth's eleventh-hour disclosure of evidence pertaining to the Michael Attaway photo array. **This resulted in [Appellant]**, who had already been in custody for nearly two and a half years, **having to wait an additional five months for trial.** The Courts of this Commonwealth have previously found that such an outrageous discovery violation concerning *Brady* necessitates dismissal of the case. *Commonwealth v. Smith*, 615 A.2d 321 (Pa. 1992) (charges dismissed and retrial barred due to substantial *Brady* violation). . . .

Appellant's Brief at 21 (emphases added).

"Under *Brady* and [its progeny,] a prosecutor has an obligation to disclose all exculpatory information material to the guilt or punishment of an accused[.]" *Commonwealth v. Chmiel*, 30 A.3d 1111, 1129 (Pa. 2011).

- 18 -

"[S]uch evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" . . . In sum, there are three necessary components to demonstrate a *Brady* violation: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."

*Commonwealth v. Causey*, 833 A.2d 165, 170 (Pa. Super. 2003) (citations

omitted).

Here, the trial court discussed:

By granting a continuance, this Court elected to pursue the most fundamentally sound solution to the present issue, and did everything in its power to preserve [Appellant's] right to a full, fair, and speedy trial. Prior to trial, [Appellant] received all of the *Brady* material in question, and with the benefit of that material, was granted sufficient time for him and trial counsel to prepare an effective defense. At trial, defense counsel thoroughly cross-examined Detective Kelhower concerning his investigation of Attaway as a potential suspect. [N.T., 1/31/19, at 219-82.] Trial counsel further examined Brooks, Singleton, and Damian-Lopez concerning their prior identification of the assailant as having a tattoo under his left eye. [N.T., 1/29/19, at 62-70, 185-98, 261-301.] Trial counsel further called Detective Joseph Murray as a defense witness, who, under examination, admitted that he both misplaced and failed to provide this discovery material to the Commonwealth's attorneys. [N.T., 2/4/19, at 182-96.]

The above facts clearly indicate [Appellant] had the opportunity to fully present any evidence pursuant to the discovery materials the Commonwealth failed to disclose in anticipation of the August 1, 2018 trial date. As a result of this evidence, the jury was able to fully consider the methods used to identify [Appellant] as the perpetrator, and consider any discrepancies that appeared in the witnesses' description of the perpetrator, including the presence or non-presence of facial tattoos. Having considered all of this evidence, and knowing that [Appellant] did not have the tattoos described over the course of the investigation, the jury still elected to convict him in each

- 19 -

matter. Accordingly, [Appellant] fails to demonstrate prejudice and is not entitled to relief.

Trial Ct. Op. at 16-17.

Appellant's sole issue is that the Commonwealth's ***Brady*** violation resulted in his having to wait, "after numerous prior continuances," "an additional five months for trial." Appellant's Brief at 21. The premise of this argument is mistaken. Although the trial court continued trial on August 3, 2018, due to the disclosure of the ***Brady*** material, the court also pointed out that an "October 22, 2018, trial date was rescheduled to January 28, 2019, because of defense counsel's unavailability." Trial Ct. Op. at 1 n.1. This continuance spanned approximately three months.

Furthermore, the trial court criticized the Commonwealth's "lack of preparedness" and "piecemeal passing of discovery," and acknowledged there were "five trial date continuances, borne primarily by the Commonwealth's inability to [timely] provide discovery." Trial Ct. Op. at 1 n.1, 15-16. However, the court also noted: (1) it appointed new defense counsel "after [Appellant] attempted to assault previously appointed counsel;" (2) the parties made an earlier joint continuance request, from March 18 to July 30, 2018, "for defense review of additional discovery concerning [Appellant's] use of a phone number spoofing application;" and, as stated above, (3) defense counsel was unavailable, after the ***Brady*** continuance, resulting in a three-month continuance. ***Id.*** at 1 n.1.

Whereas Appellant requests dismissal of the charges, we note, as did the trial court, that "dismissal . . . is an extreme sanction that should be imposed sparingly and only in cases of blatant prosecutorial misconduct." **See** Trial Ct. Op. at 15, *citing* **Commonwealth v. Wilson**, 147 A.3d 7, 13 (Pa. Super. 2016). Incorporating our foregoing discussion, the approximately two-month continuance attributable to the Commonwealth's late disclosure of the Attaway photo array, in itself, did not constitute prejudice requiring dismissal of the charges. Thus, we conclude no relief is due.

Finding no merit to any of Appellant's issues, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/29/20