J-A11015-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JONATHON RODRIGUEZ | : | |
| | : | |
| Appellant | : | No. 1425 MDA 2024 |

Appeal from the Judgment of Sentence Entered March 25, 2024
In the Court of Common Pleas of Berks County Criminal Division at
No(s): CP-06-CR-0000217-2023

BEFORE: MURRAY, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY MURRAY, J.: **FILED: MAY 15, 2025**

Jonathon Rodriguez (Appellant) appeals, *nunc pro tunc*, from the judgment of sentence imposed following his jury convictions of two counts each of first-degree murder, aggravated assault – serious bodily injury, and robbery – inflict bodily injury; three counts of criminal conspiracy; and one count of possession of an instrument of crime.[1] After careful review, we affirm.

Appellant and his co-defendant, Emanuel Soto (Soto), were each charged with two counts of first-degree murder and various additional felonies in connection with the March 10, 2022, shooting deaths of Marques Sudler

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2502(a), 2702(a)(1), 3701(1)(i), 903, 907.

(Sudler) and Taurice Green (Green).[2]  By way of background, Cory Rodriguez (Cory) lived at and sold various drugs from 661 Gordon Street in Reading (the residence) until January 2022.  **See** N.T. (Jury Trial), 2/12-21/24, at 411.  Additionally, Appellant and Soto sold controlled substances from the residence, beginning at some point in 2021.  **See id.** at 416-17.

Darrian Kreitz (Kreitz), who had known Cory for approximately 10 years, began buying crystal methamphetamine (meth) from Cory in 2021.  **See id.** at 225; **see also id.** at 226 (Kreitz explaining that in November and December 2021, he bought crystal meth from Cory daily).  Kreitz regularly saw Appellant and Soto at the residence.  **See id.** at 227.  Kreitz also bought drugs from Appellant at times.  **See id.** at 228.

Kreitz also sold marijuana "on and off for a while."  **Id.** at 234.  Kreitz had experience stealing from drug dealers.  **See id.** at 236.  Further, "Kreitz previously had had conversations with Cory [] and [Appellant] about setting up people for robberies."  Trial Court Opinion, 10/30/24, at 2.

The trial court summarized the events of March 10, 2022:

> Kreitz reached out to Sudler asking him for five pounds of marijuana….  Kreitz continued to text with Sudler on March 10, 2022, telling him he wanted [] five pounds of marijuana.  These text messages start around 6:22 p[.]m[.] and continued until just prior to the homicides.

---

[2] Appellant was tried with co-defendant Soto, and the jury convicted Soto of the same crimes as Appellant.  The trial court sentenced Soto, who was 17 years old at the time of the shooting, to an aggregate 70 years to life in prison.  Soto filed a separate appeal, which is docketed in this Court at 787 MDA 2024.

Kreitz continued texting and discussing the robbery of Sudler with Cory []. Cory [] and Kreitz had previously set up robberies together. … Cory [] told Kreitz he had someone who could help him with the robbery and directed him to the [residence,] where he met with [Appellant] and Soto. … [Appellant] had previously told Kreitz that if they did a robbery together that he would make sure it went smoothly.

Kreitz informed Julian [Gray] ("[Gray]")[3] he knew individuals on Gordon Street that could help him carry out the robbery. [Gray] told Kreitz he would be the getaway driver. [Gray] then drove Kreitz to the area of Gordon Street[,] where he parked his car on the corner of Gordon and Oley Street[s]. Kreitz got out of the car and went into the residence….

Once in the residence[,] Kreitz met with [Appellant] and Soto. Kreitz informed [Appellant] that he had someone name[d] Sudler they could rob, and he had been talking with Sudler[,] and they had to do [the] robbery now because Sudler had to go to work. Meanwhile, Sudler had picked up [Green] and told [Green's] girlfriend, Ianna Richardson, they were going to see some "white boy" on Miltimore Street.[4] Sudler had started texting "white boy" around 8 p.m.[,] and he and Green left the residence around 11 p.m. "White boy" is the nickname for [] Kreitz.

[Appellant] instructed Kreitz to tell Sudler to pull up to the back of the [residence] and they would do the robbery in the back. Kreitz, [Appellant,] and Soto then went out the back door and continued to discuss how they would do the robbery. When they left the [residence,] Soto had a black shotgun[,] and [Appellant] had a pistol with a switch on the back. [Appellant] told Kreitz to send Sudler to 663 Miltimore Street. Kreitz, [Appellant,] and Soto discussed dividing the proceeds of the robbery.

Kreitz had previously seen multiple guns at the [residence] when he bought drugs. Specifically, he had seen a black shotgun,

---

[3] Gray testified he met Kreitz, whom he knew as "Loki," while they worked together at Edible Arrangements. N.T., 2/12-21/24, at 756-57. Gray stated he sometimes gave Kreitz rides to "[v]arious places." *Id.* at 758.

[4] The residence is "connected to the 600 block of Miltimore Street by an alley." Trial Court Opinion, 10/30/24, at 8.

a tannish brown pistol with an extended magazine[,] and another gun with an extended clip. Kreitz had also previously seen Soto holding the shotgun and [Appellant] in possession of firearms on previous occasions.

Kreitz, [Appellant,] and Soto continued to discuss how the robbery would occur inside a garage [located at] 6[6]3 Miltimore Street. Kreitz informed [Appellant] and Soto that another person would be coming with Sudler. [Appellant] told Kreitz when the car arrived to go out and open the car door[,] and then [Appellant] and Soto would come out. [Appellant] instructed Kreitz to point his gun at Sudler and tell him to put the car in park. [Appellant] stated that if Sudler started reaching for a weapon he was going to start shooting.

Kreitz directed Sudler to 663 Miltimore Street on March 10, 2022, at approximately 11:30 p[.]m. At 11:31 p.m.[,] Sudler called Kreitz and told him that he was on Miltimore Street. When Kreitz came out of the garage[,] Sudler flashed the lights of his car. Kreitz then walked up to Sudler's car[,] and as he was opening the rear door[,] he observed another male in the front passenger seat. Kreitz then sat part way in the back of the car. Kreitz then observed [Appellant] and Soto approaching the car with masks on. [Appellant] and Soto ran up to the car and [Appellant] pointed his gun at Sudler. After [Appellant] pointed his gun, gunshots erupted. Kreitz ran when the gunshots started. Kreitz never saw Sudler or the front seat passenger with a firearm. Kreitz ran to where [Gray] was parked, and they drove off.

Trial Court Opinion, 10/30/24, at 3-5 (citations to record omitted; footnotes added); *see also id.* at 5 (indicating Kreitz's DNA was found on the rear passenger door of Sudler's car).[5]

---

[5] Kreitz was also charged in connection with the robbery. Kreitz pled guilty to two counts of robbery and one count of conspiracy and was sentenced to an aggregate 9 to 18 years in prison. He testified against Appellant and Soto at trial.

Megan Beine (Beine) and Dashia Patterson (Patterson), friends of Appellant and Soto, were also at the residence on March 10, 2022. After the shooting, Beine and Patterson located Sudler and Green, then called 911.

The trial court described the emergency response:

Anthony Louis Como [("Como")], a paramedic firefighter[,] arrived in the area of Miltimore and Oley Streets … at approximately 11:45 p[.]m. [Como] observed a sedan in the middle of the roadway with both doors open[,] one person in the driver's seat[,] and one person laying on the ground next to the passenger side of the vehicle. The individual in the driver's seat had a faint pulse[,] and [Como] observed [the individual] had a penetrat[ing] wound under his left armpit. This individual was transported by ambulance to the Reading Hospital and later died.

[Reading Police] Officer [Victor] Morrison [("Officer Morrison")] … responded for a shots fired call in the area of Oley and Miltimore Streets [at approximately 11:45 p.m.] [Officer Morrison] observed EMS working on two males[,] both of whom appeared [to have been] shot. Officer Morrison observed what appeared to be damage from gunfire to the front windshield and driver's door [of the car]. In addition, he observed shell casings on the rear trunk lid, the roof of the vehicle[,] and behind the vehicle.

Officer Martinez[6] was employed … as an Evidence Technician and responded to the 600 block of Miltimore Street. [Officer Martinez] located four spent .40 caliber shell casings on and around the vehicle[. T]wo cell phones were recovered from the vehicle[,] as well as two firearms. One firearm was located on an inside coat pocket of … Sudler. The second firearm was located on the driver's side floor. There was a hole in the front passenger side window from a projectile. Officer Martinez lifted a total of seven [finger]prints from the vehicle. [A p]rojectile penetrated the front passenger side door window. Pellets that were consistent with those being shot from a [shotgun] were found throughout the interior of the car. A bullet projectile was found

_____

[6] Officer Martinez's first name is not apparent from the certified record.

- 5 -

inside the center console. Marijuana was located inside the trunk of the vehicle.

*Id.* at 7-8 (citations to record omitted; footnote added).

The day after the shooting, Appellant and Soto met with Cory and described the prior day's events:

During this meeting, [Appellant], in the presence of Soto, stated that [prior to the shooting,] Kreitz had informed him that he had an easy target for a robbery of five pounds of marijuana. [Appellant] further stated that they had an agreement to direct the targets to meet at an abandoned house on Miltimore Street. [Appellant] could see the targets in the car, and he made his way to the car so they wouldn't see him coming[.] … Kreitz was already in the car. [Appellant] stated that both he and Soto came from behind the car and that Soto posted behind the car with a shotgun as [Appellant] walked around the front driver's side to see both targets. [Appellant] told [Cory] that both targets had guns, so he pulled his out[;] the passenger raised a gun and wasn't following instructions, so [Appellant] shot and then Soto shot, and [Appellant and Soto] ran. Soto did not do the majority of the talking[,] but he engaged in the conversation. [Appellant] stated that he had a pistol and Soto had a shotgun.

*Id.* at 6 (citations to record omitted).

Neil Hoffman, M.D. (Dr. Hoffman), a forensic pathologist, performed the autopsies of Sudler and Green.[7] The trial court summarized Dr. Hoffman's autopsy reports and testimony:

Sudler was shot at close range, within 3 to 12 inches from the muzzle of the firearm to his clothing. During the autopsy[,] 6

_____

[7] Dr. Hoffman testified at trial as a forensic pathology expert and was permitted to render an opinion concerning the cause and manner of death for Sudler and Green. *See* N.T., 2/12-21/24, at 932.

- 6 -

gunshot wounds were located. The first[8] gunshot wound was to the chest. The second gunshot wound passed through the back of the chest and [a bullet] was recovered from the back of the neck. The third gunshot went into the left arm. The fourth gunshot was a through and through wound of the front surface of the left forearm. The fifth gunshot was in the back of Sudler's neck. The [sixth] wound was a shotgun wound and went into the back of [Sudler's] head[,] and it penetrated the bone of the cranium. Multiple pellets were seen, and several were recovered. The manner of Sudler's death was homicide.

The cause of death for Green was perforations of the lungs, heart, spleen and left kidney due to gunshot wounds [to the] chest and abdomen. Green suffered two gunshot wounds in addition to a shotgun wound. The gunshot wounds both penetrated the torso. The first one perforated the left lung, the heart, [and] the second rib and led to bleeding around the heart and into the chest cavit[y]. The second one went into the abdomen and perforated the spleen and left kidney. Both gunshot wounds perforated vital organs. The shotgun wound was located in the right deltoid region. Green's manner of death was homicide.

*Id.* at 8-9 (citations to record omitted; footnote added); *see also* N.T., 2/12-21/24, at 935-36 (wherein Dr. Hoffman testified Sudler's cause of death was perforations of the lungs, bronchi, and pulmonary arteries due to gunshot wounds to the chest).

Further, during the investigation, police obtained video footage from the area, as well as phone records and Facebook Messenger records.

Criminal Investigator Joseph Ring [("Investigator Ring")] … was the lead investigator. Video footage from cameras in the area show the victims['] vehicle arrive in the 600 block of Miltimore Street, pull to the side of the road[,] and flash the high beams. A second video clip shows two individuals approach on the

_____

[8] Dr. Hoffman explained he numbered the wounds in the order of "their complexity or their severity," but his numbering did not necessarily correlate to when each shot occurred. N.T., 2/12-21/24, at 936.

passenger side and then one of those individuals, identified as Kreitz, is seen running.

Trial Court Opinion, 10/30/24, at 8; *see also id.* at 5 (explaining the video shows Kreitz running from the scene "approximately 30 seconds after the gunshots are heard."). Two vehicles then pass through the camera's field of view, one of which belonged to Gray. *Id.* at 5.

After executing a search warrant on Appellant's cell phone,

police recovered text messages, images, call logs and contacts. A photo dated March 10, 2022, showed [Appellant] holding a gun with an extended magazine and a switch on the back. In addition, they located a video of a hotel party from September 2021. In the video[,] Soto is seen with a shotgun.

….

Joellius Medina [("Medina")] was friends with both [Appellant] and Soto. At the time of the homicides[,] Medina lived in Texas. Medina had seen both [Appellant and Soto] in possession of both a pistol and shotgun on prior occasions. On March 10, 2022, [Appellant] texted Medina a picture of a Glock firearm with a switch attachment. On March 11, 2022, [Appellant] contacted Medina from an unknown number and asked if he could go to Texas and stay with him. [Appellant] told [Medina] that [the night of the shooting,] he had been outside selling drugs and a car pulled up, lowered its windows[,] and he got scared so he pulled out his gun and shot. [Appellant] later sen[t] Medina the newspaper article that discussed the double homicide.

*Id.* at 6-7 (citations to record omitted).

Police also executed a search warrant on Sudler's cell phone. The search revealed a Facebook Messenger conversation between Sudler and Kreitz, during which the pair discussed the sale of five pounds of marijuana. *Id.* at 8; *see also* Commonwealth's Exhibit 5, pp. 41-49 (depicting Facebook

- 8 -

Messenger conversation). Kreitz directed Sudler to 663 Miltimore Street. Commonwealth's Exhibit 5, p. 47.

Additionally, police obtained call detail records and cell site location information (CSLI) for the various individuals involved in the events of March 10, 2022. The Commonwealth introduced this information as evidence through the testimony of Criminal Investigator Trevor Atkins (Investigator Atkins).

Appellant was arrested on April 5, 2022, as part of an unrelated investigation. After his arrest, police completed a forensic data extraction of Appellant's cell phone. *See* Criminal Complaint, 1/19/23, Affidavit of Probable Cause, at 13. From this extraction, police identified evidence relevant to the instant case, including, *inter alia*, a text message from Appellant to an unknown number, telling the individual Appellant's address is 663 Miltimore Street; images of Appellant in possession of firearms; CSLI; and email and Uber account information referencing Appellant's aliases. ***See id.*** at 13-14. Kreitz participated in an interview with investigators in October 2022, during which Kreitz implicated Appellant and Soto in the murders.

On September 20, 2023, the Commonwealth filed a motion *in limine* seeking to introduce evidence of, *inter alia*, Appellant's prior firearms possession. ***See*** Commonwealth's Motion *in Limine*, 9/30/23, ¶¶ 11-17. The Commonwealth identified various videos, text message conversations, Facebook Messenger exchanges, and photographs recovered during searches

of the participants' cell phones and Facebook records. *See id.*, ¶ 11. The Commonwealth argued the evidence did not violate Pa.R.E. 404(b)[9] because Appellant had not been charged with a possessory firearms offense. *Id.*, ¶ 13. In the alternative, the Commonwealth argued the evidence was admissible under the *res gestae* exception, and its probative value outweighed any prejudicial effect. *Id.*, ¶¶ 14, 17. Following a hearing, the trial court granted in part and denied in part the Commonwealth's motion *in limine*. The court denied the Commonwealth's motion *in limine* and precluded as evidence one video of Appellant using a firearm with an automatic switch and a text message exchange between Appellant and an unrelated individual. The court granted the Commonwealth's motion with respect to the remaining videos, photographs, and text messages.

The matter proceeded to a jury trial, which took place on February 12-21, 2024. The jury convicted Appellant of the above-mentioned crimes. On March 25, 2024, the trial court sentenced Appellant to two consecutive life sentences. Appellant filed a timely notice of appeal. The trial court thereafter ordered Appellant to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.

---

[9] Rule 404(b) generally prohibits "[e]vidence of any other crime, wrong, or act" when it is used "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Pa.R.E. 404(b).

On May 30, 2024, the trial court granted Appellant's trial counsel leave to withdraw his appearance and appointed appellate counsel. Subsequently, the trial court granted Appellant an extension of time to file a Rule 1925(b) concise statement. By an order entered on August 12, 2024, this Court dismissed the appeal based on Appellant's failure to file a docketing statement.

On September 20, 2024, Appellant filed a Post Conviction Relief Act (PCRA)[10] petition seeking reinstatement of his direct appeal rights, *nunc pro tunc*. Appellate counsel explained that trial counsel remained as counsel of record on the appellate docket until September 2024, despite withdrawing from representation in May. Appellate counsel claimed that, as a result, she did not receive correspondence from this Court. The PCRA court granted Appellant's PCRA petition and reinstated Appellant's direct appeal rights.

Appellant filed a *nunc pro tunc* notice of appeal on September 27, 2024. Appellant and the trial court have both complied with Pa.R.A.P. 1925.

Appellant raises the following issues for review:

1. Was the evidence presented at trial insufficient to sustain the conviction of murder in the first degree, where there was insufficient evidence of malice and specific intent to kill?

2. Did the trial court abuse its discretion in admitting the following evidence over the objection of trial counsel, when this evidence was not relevant, and more prejudicial than probative:

_____

[10] 42 Pa.C.S.A. §§ 9541-9546.

A. A video clip from September 25, 2021, showing [] Appellant with a firearm;

B. Two photographs, taken from [] Appellant's phone, showing [] Appellant and his co-defendant brandishing similar style weapons. These photographs were the subject of the Commonwealth's motion *in limine*, resolved by a court order on October 23, 2023[;]

C. Facebook Messenger statements, and recordings, reflecting conversations between [] Appellant and his co-defendant between January 16, 2022, and January 20, 2022;

D. Testimony from [Investigator] Atkins regarding contact between certain cell phones and cell towers.

Appellant's Brief at 9 (some capitalization modified).

In his first claim, Appellant argues the evidence presented at trial was insufficient to support his first-degree murder conviction. *Id.* at 18. In particular, Appellant contends the evidence does not establish his specific intent to kill. *Id.* Citing Dr. Hoffman's testimony and expert report, Appellant claims the evidence fails to establish the gun was <u>directed</u> at a vital part of either victim's body. *Id.* at 19-20.

Additionally, Appellant directs our attention to testimonial evidence, which, he believes, supports his assertion that he lacked a specific intent to kill. *See id.* at 20-21. Appellant cites testimony that he told Kreitz to abandon the planned robbery if Sudler brought additional people with him. *Id.* at 20. He also points to Kreitz's testimony that Appellant stated he did not want to shoot anyone. *Id.* at 21. Appellant cites Cory's testimony that "it was

Appellant who prompted [] Beine to call 911 and summon emergency medical services to the scene." *Id.*

We are mindful of our standard of review:

The standard we apply in reviewing the sufficiency of the evidence is whether[,] viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact, while passing upon the credibility of witnesses and the weight of the evidence produced[,] is free to believe all, part or none of the evidence.

*Commonwealth v. Talbert*, 129 A.3d 536, 542-43 (Pa. Super. 2015) (citation omitted).

In order for a jury to find a defendant guilty of first-degree murder, the Commonwealth must prove, beyond a reasonable doubt, the following: "(1) a human being was unlawfully killed; (2) the defendant was responsible for the killing; and (3) the defendant acted with malice and a specific intent to kill." *Commonwealth v. Martin*, 101 A.3d 706, 718 (Pa. 2014) (citing 18 Pa.C.S.A. § 2502(a)). Murder is "an intentional killing," which section 2502 defines as "[k]illing by means of poison, or by lying in wait, or by any other

- 13 -

kind of willful, deliberate and premeditated killing." 18 Pa.C.S.A. § 2502(a), (d). "The period of reflection required for premeditation to establish the specific intent to kill may be very brief; in fact, the design to kill can be formulated in a fraction of a second." ***Commonwealth v. Cannavo***, 199 A.3d 1282, 1292 (Pa. Super. 2018).

"The Commonwealth may prove that a killing was intentional solely through circumstantial evidence." ***Commonwealth v. Pagan***, 950 A.2d 270, 279 (Pa. 2008).

> A specific intent to kill may be inferred from the use of a deadly weapon to inflict injury on a vital part of the body. A deadly weapon is defined as any firearm, whether loaded or unloaded, or any device designed as a weapon and capable of producing death or serious bodily injury, or any other device or instrumentality which, in the manner in which it is used or is intended to be used, is calculated or likely to produce death or serious bodily injury.

***Talbert***, 129 A.3d at 543 (citation and brackets omitted); ***see also Cannavo***, 199 A.3d at 1292 (reiterating that a specific intent to kill may be established through circumstantial evidence, and stating that "[t]he law permits the fact finder to infer that one intends the natural and probable consequences of his acts.").

Here, there is no doubt that Sudler and Green were unlawfully killed. ***See*** N.T., 2/12-21/24, at 935-54 (Dr. Hoffman detailing his autopsy of Sudler and his conclusion that Sudler's cause of death was perforations of the lungs, bronchi, and pulmonary arteries due to a gunshot wound to the chest, and that Sudler's manner of death was homicide), 940 (identifying one gunshot

wound, which Sudler sustained from a projectile fired from close range); *id.* at 954-61 (Dr. Hoffman detailing his autopsy of Green and his conclusion that Green's cause of death was perforations of the lungs, heart, spleen, and kidney due to gunshot wounds to the chest, and that Green's manner of death was homicide); *see also* Commonwealth's Exhibits 12 (autopsy report – Green) and 13 (autopsy report – Sudler). Nor does Appellant dispute his identity as one of the shooters.

Appellant solely challenges the *mens rea* required for first-degree murder, which the trial court addressed as follows:

> When [Appellant] and Soto left [the residence], Soto had a black shotgun and [Appellant] had a pistol with a switch on the back[,] and they had a plan to rob Sudler … of marijuana. The plan included Kreitz pointing his gun at Sudler and Green and directing them to park the car. [Appellant] further stated that if Sudler were to start reaching for a weapon[, Appellant] was going to start shooting. Sudler called Kreitz at 11:31 p[.]m[.] and informed [Kreitz] he was on Miltimore Street. Kreitz walked up to Sudler's car and opened the rear door[,] and then observed [Appellant] and Soto approaching Sudler's car. [Appellant] and Soto ran up to the car with masks on and [Appellant] pointed his gun at Sudler. After [Appellant] pointed his gun, gunshots erupted. [Appellant] stated that Sudler did not follow his commands, so [Appellant] shot him[,] and then Soto started shooting[,] and they ran.

Trial Court Opinion, 10/30/24, at 12. The trial court reiterated that Sudler and Green were each shot multiple times. *See id.* at 12-13. The court also stated:

> [A] firearm is a deadly weapon, and the chest is a vital part of the body. Pennsylvania law makes no distinction between parts of the chest that are vital or non-vital. The Pennsylvania Supreme Court has held that 'the chest and abdomen house the human body's

chief circulatory and digestive organs, as well as a network of vital arteries and veins which supply them and, thus, are vital areas of the body.' [**Commonwealth v.**] **Briggs**, [12 A.3d 291, 307 (Pa. 2011)].

Trial Court Opinion, 10/30/24, at 13.

Upon review, we conclude the direct and circumstantial evidence, viewed in the light most favorable to the Commonwealth, clearly supports a finding of specific intent, inferred from the use of a deadly weapon to inflict injury on a vital part of the victims' bodies. **See Talbert**, 129 A.3d at 543-44 (concluding the evidence supported a finding of specific intent to kill, where two victims each suffered more than a dozen gunshot wounds to vital parts of the body, and evidence corroborated the appellant's role as a shooter). Thus, Appellant's first claim lacks merit.

In his second claim, Appellant challenges the admission of certain evidence at trial. We adhere to the following standard of review:

> The admission of evidence is committed to the sound discretion of the trial court, and a trial court's ruling regarding the admission of evidence will not be disturbed on appeal unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will or such lack of support to be clearly erroneous.

**Commonwealth v. Mangel**, 181 A.3d 1154, 1158 (Pa. Super. 2018) (citation omitted).

First, Appellant challenges the admission of a video showing him pointing a pistol toward the camera and laughing, as well as two photographs

depicting Appellant and Soto handling firearms. Appellant's Brief at 22.[11, 12]

In the video and photographs, Appellant is depicted wearing a hood and mask.

*Id.* Appellant asserts the Commonwealth introduced the video and photographs to improperly establish his propensity to commit crimes. *Id.* at 23. Appellant emphasizes that police did not recover any firearms from the crime scene, and argues any evidence concerning his own familiarity with or access to firearms is irrelevant. *Id.*

The Commonwealth counters Appellant waived his challenge to the admission of the two photographs by failing to object to their introduction at trial. Commonwealth Brief at 14. The Commonwealth acknowledges the parties litigated motions *in limine* prior to trial, but claims the two photographs challenged in the instant appeal were not the subject of the motions *in limine*.

---

[11] Despite identifying the video and photographs as separate sub-issues in his statement of questions involved, Appellant addresses them together in his brief.

[12] Appellant identifies the video as Commonwealth's Exhibit 7. In his appellate brief, Appellant does not identify the particular photographs at issue. However, from the notes of testimony pages cited, it appears Appellant challenges the photographs shown at trial on slides 253 and 254 of the Commonwealth's PowerPoint presentation. *See* Appellant's Brief at 22. Our review of the trial exhibits reveals these slide numbers correspond to portions of Commonwealth's Exhibit 21. Additionally, slide 253 is a video, but it also contains a still photograph taken from the video. *See* Commonwealth's Exhibit 21 (slide 253); *see also* N.T., 2/12-21/24, at 1178 (Investigator Ring describing slide 253 as containing "a screen capture of an extraction from [Appellant's] phone which is a video file"), 1181 (Investigator Ring describing slide 253 as a video file).

*Id.* at 15.[13]  Alternatively, the Commonwealth argues the photographs and video were admissible under the similar weapon exception (discussed *infra*). *Id.* at 11-14.

"The threshold inquiry with admission of evidence is whether the evidence is relevant."  *Commonwealth v. Yale*, 249 A.3d 1001, 1022 (Pa. 2021) (citation omitted).  "Evidence is relevant if … it has any tendency to make a fact more or less probable than it would be without the evidence[.]" Pa.R.E. 401(a).  "All relevant evidence is admissible, except as otherwise provided by law.  Evidence that is not relevant is not admissible."  Pa.R.E. 402; *see also Yale*, 249 A.3d at 1022.  Relevant evidence may be excluded if its probative value is outweighed by a danger of unfair prejudice or misleading the jury.  Pa.R.E. 403.

As stated above, Pa.R.E. 404(b) prohibits the admission of evidence of "any other crime, wrong, or act" which is used "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Pa.R.E. 404(b)(1).  Subsection (b)(2) permits such evidence if it is

---

[13] Our review of the trial transcripts confirms Appellant did not lodge an objection to the introduction of the photographs at the time they were introduced.  It is well settled that "[t]he absence of a contemporaneous objection below constitutes a waiver of the claim on appeal." *Commonwealth v. Smith*, 213 A.3d 307, 309 (Pa. Super. 2019) (citation and quotation marks omitted).  Nevertheless, we will address the trial court's admission of the photographs in conjunction with Appellant's challenge to the admission of the video.

admissible for another purpose, such as providing motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

Pa.R.E. 404(b)(2).

Regarding the similar weapon exception, our Supreme Court has explained:

A weapon not "specifically linked" to the crime is generally inadmissible; however, the fact that the accused had a weapon or implement suitable to the commission of the crime charged … is always a proper ingredient of any case for the prosecution. Any uncertainty that the weapon is the actual weapon used in the crime goes to the weight of the evidence. The only burden on the prosecution is to lay a foundation that would justify an inference by the finder of fact of the likelihood that the weapon was used in the commission of the crime.

*Commonwealth v. Christine*, 125 A.3d 394, 400 (Pa. 2015) (citations and some quotation marks omitted).

"[A] weapon may not be introduced solely based on similarity." *Commonwealth v. Holt*, 273 A.3d 514, 537 (Pa. 2022). "The theory of the exception is that the weapon possessed **could have been** the weapon used…." *Christine*, 125 A.3d at 400 (emphasis added). *Cf. id.* (concluding a shank recovered from the appellant's prison cell was not admissible under the similar weapon exception, where a razor blade was used in the crime charged).

Instantly, Kreitz, who frequently visited the residence to purchase drugs, testified that he had previously seen "a black shotgun …, a tannish

brown pistol with an extended magazine in it, and … another gun … with an extended clip in it." N.T., 2/12-21/24, at 258; *see also id.* at 261 (stating that during his visits to the residence, Kreitz "would always just see those same two pistols and that black shotgun"). Kreitz recalled Soto holding a black shotgun on two occasions. *Id.* at 259. During one visit, Kreitz also saw Appellant sitting at a computer with a pistol lying next to him. *Id.* at 260.

Kreitz testified extensively concerning the formation of his plan to rob Sudler with the help of Appellant and Soto. *See id.* at 251, 256-57, 261-95. When Kreitz first arrived at the residence on March 10, 2022, Appellant was not present. *See id.* at 283-84. When Appellant returned to the residence a few minutes later, he was wearing a ski mask, and Kreitz observed a pistol with an extended clip in the pocket of Appellant's hoodie. *Id.* at 285. Kreitz, Appellant, and Soto walked outside and began discussing the logistics of the robbery. *Id.* at 289. Kreitz testified that, at that time, Appellant was carrying the pistol and Soto was carrying a black shotgun. *Id.* at 289-90.

Further, Dr. Hoffman's autopsy reports and trial testimony confirm Sudler and Green suffered gunshot wounds, as well as wounds from shotgun pellets. *See id.* at 935-54 (detailing Sudler's injuries, cause of death, and manner of death), 954-61 (detailing Green's injuries, cause of death, and manner of death); *see also* Commonwealth's Exhibits 12 (autopsy report – Green) and 13 (autopsy report – Sudler).

Upon review, we discern no abuse of the trial court's discretion in admitting the video and photographs into evidence, where the Commonwealth laid a proper foundation upon which the jury could infer the weapons depicted were the ones used in the shooting. **See Holt**, 273 A.3d at 535-39 (concluding a witness's testimony that he observed the appellant with a .40 caliber handgun just weeks before the shooting at issue—which resulted in the death of a police officer—was admissible under the similar weapon exception to demonstrate the appellant's familiarity with and access to a .40 caliber firearm); **see also Commonwealth v. Cintron**, 63 EDA 2024, 2024 WL 5039612 (Pa. Super. 2024) (unpublished memorandum at 12-16) (concluding evidence of the Cobra handgun recovered upon the appellant's arrest was properly admitted under the similar weapon exception, where the victim identified the appellant as the individual who had shot at him; the victim described the handgun used as chrome or silver; and the arresting officer described recovering a "black handgun with a gray top");[14] **Commonwealth v. Payton**, 285 A.3d 952 (Pa. Super. 2022) (unpublished memorandum at 13-14) (concluding evidence that an unregistered .38 caliber revolver found in the appellant's car two weeks after a shooting was admissible under the similar weapon exception, where the victim testified he "knew" the appellant shot at him with what looked like a Glock 40 semiautomatic pistol; an expert

_____

[14] **See** Pa.R.A.P. 126(b) (providing that we may consider, for persuasive value, unpublished memoranda filed after May 1, 2019).

testified the bullet recovered from the victim's bedroom could have been fired by either a .38 revolver or a 9-milimeter semiautomatic pistol; and a .38 revolver would not have ejected a fired cartridge casing).

Here, Kreitz observed Appellant with a similar pistol prior to the shooting and testified Appellant used a pistol during the robbery. The challenged video and photographs, which were taken 18 days after the robbery, also depict Appellant handling a pistol similar to the one described by Kreitz. Under these circumstances, the jury could reasonably infer the weapons depicted in the video and photographs were the weapons used in the robbery and shooting. Further, "[a]ny uncertainty that the weapon is the actual weapon used in the crime goes to the weight of the evidence." *Christine*, 125 A.3d at 400. Thus, Appellant's argument lacks merit.

Next, Appellant asserts the trial court improperly admitted into evidence Facebook messages between Appellant and Soto, wherein Appellant asked Soto to bring a "black shotty" to the residence. Appellant's Brief at 24. Appellant claims this evidence was "stale," as the messages were exchanged approximately two months prior to the shooting. *Id.*

The Commonwealth counters Appellant waived this argument by failing to challenge the admission of the Facebook messages before the trial court. Commonwealth Brief at 16-17.

Instantly, through its pretrial motion *in limine*, the Commonwealth sought to introduce statements from a January 19, 2022, Facebook Messenger

exchange between Appellant and Soto. *See* Motion *in Limine*, 9/28/23, ¶ 11f. In the messages, Appellant instructed Soto to "take a cab over to bring me the black shotty[,]" to which Soto replies, "I'm cleaning up it's gon be a min." *Id.*

During the hearing on the motion *in limine*, Appellant's counsel advanced a "blanket authentication objection." N.T., 10/5/23, at 10; *see also id.* at 11 (explaining "there is an authentication issue" until a witness lays a foundation that the relevant evidence was recovered from Appellant's phone pursuant to a search warrant). Our review of the hearing transcript confirms that Appellant did not object to the Facebook messages between Appellant and Soto on any other basis.

Moreover, Appellant did not raise a contemporaneous objection during trial. During a sidebar discussion, the prosecution requested clarification concerning whether the Commonwealth could publish the Facebook messages[15] to the jury. *See* N.T., 2/12-21/24, at 1165. Appellant's counsel stated:

> **I have no issue with the context of the messages coming in**, but it's the fact that this was created by the Commonwealth …. I have no objection to [Investigator Ring] producing the messages between the two.

---

[15] The challenged Facebook messages between Appellant and Soto appear on slide 231 of the Commonwealth's PowerPoint, as part of Commonwealth's Exhibit 21.

*Id.* at 1166 (emphasis added). Investigator Ring subsequently read the messages for the jury, **without objection by Appellant**. *See id.* at 1168. Because Appellant did not object to the admission of the Facebook messages on the basis of staleness during the litigation of the motion *in limine* or when the messages were introduced at trial, this argument is waived. *See Smith*, 213 A.3d at 309.[16]

Finally, Appellant argues the trial court improperly allowed Investigator Atkins to testify concerning Appellant's CSLI, which indicated Appellant was near the crime scene "at critical moments." *See* Appellant's Brief at 25-27. Appellant emphasizes that Investigator Atkins was not recognized as an expert witness.[17] *Id.* at 25. According to Appellant, because Investigator Atkins was

---

[16] Even if Appellant had properly preserved this argument, we would conclude that it lacks merit. The challenged Facebook messages, much like the video and photographs we addressed *supra*, were relevant to show Appellant's familiarity with and access to firearms similar to those used in the shooting. *See* Trial Court Opinion, 10/30/24, at 15. Appellant fails to establish that any potential prejudice resulting from the admission of the messages outweighed their probative value.

[17] The Commonwealth offered Investigator Atkins as an expert in the field of CSLI. N.T., 2/12-21/24, at 857. Both Appellant's and Soto's counsel objected to Investigator Atkins's qualifications. *Id.* at 862. A lengthy sidebar discussion ensued, after which the trial court concluded Investigator Atkins could not testify as an expert. *See id.* at 862-76. The trial court sustained the objection and stated Investigator Atkins could testify as a fact witness based on the phone records he received from AT&T. *Id.* at 876, 962; *see also id.* (trial court stating, "I believe that [Investigator Atkins] can testify that he received this information from AT&T, he plotted the information as anybody, as you said, can plot this into Google maps, and that comes up with the cell phone tower and the direction."). Thereafter, Appellant's counsel
*(Footnote Continued Next Page)*

- 24 -

not an expert witness, his testimony was merely speculative and therefore irrelevant. *Id.* at 27.[18]

At trial, Investigator Atkins testified that CSLI is useful "to determine a general location" of the cell phones used by Appellant and other individuals involved in the March 10, 2022, robbery. N.T., 2/12-21/24, at 963. Investigator Atkins explained that cell phone providers "maintain databases that collect and store the usage[, *i.e.*, call detail records,] for each individual customer that they have." *Id.* at 964. The call detail records include the date, time, duration, and cell site location for a device's voice calls, text messages, and date sessions. *Id.*

_____

objected to Investigator Atkins's proposed fact testimony as irrelevant and misleading, because a cell phone does not necessarily "hit" off of the closest cell tower. *Id.* at 883-84.

The parties also engaged in a lengthy discussion regarding a shaded map of the area surrounding the residence, which investigators used to illustrate the sectors of cell coverage provided by each tower. *See id.* at 900-11. Appellant's counsel objected to the shaded maps as irrelevant and misleading. *Id.* at 902, 910. Investigator Atkins agreed to modify the map before the Commonwealth offered it as an exhibit. *Id.* at 911.

[18] Appellant's argument includes only a cursory citation to the test for relevant evidence set forth in Pa.R.E. 401. Appellant otherwise fails to support this claim with citation to and discussion of relevant legal authority. *See* Pa.R.A.P. 2119(a) (providing the argument section of an appellate brief shall include "such discussion and citation of authorities as are deemed pertinent"). We could deem Appellant's final argument waived on this basis. *See Commonwealth v. Samuel*, 102 A.3d 1001, 1005 (Pa. Super. 2014) (concluding that appellant waived his claim by failing to adequately develop his argument or provide citation to and discussion of relevant authority).

Police obtained call detail records for Appellant's cell phone through AT&T. *Id.* at 971. Police then utilized CellHawk software, which uses the data provided by the cell phone provider to plot location information on a map. *See id.* at 907, 972. Throughout his testimony, Investigator Atkins testified regarding the contents of Appellant's CSLI using the call detail records provided by AT&T and the CellHawk map. *See id.* at 971-81. Investigator Atkins also explained that "cell phones will connect to the tower with the best signal that's based on the signal strength and signal quality. It's not necessarily the closest tower." *Id.* at 975.

We reiterate that "[e]vidence is relevant if … it has **any** tendency to make a fact more or less probable than it would be without the evidence[.]" Pa.R.E. 401(a) (emphasis added). As Appellant acknowledges, Rule 401 establishes a "low bar" for relevance, Appellant's Brief at 28, and "evidence need not be conclusive" to be relevant. *Commonwealth v. Alderman*, 811 A.2d 592, 595 (Pa. Super. 2002) (citation omitted). Our review confirms the CSLI evidence, presented through the testimony of Investigator Atkins, was relevant to establish Appellant's presence in the area surrounding the residence on the night of March 10, 2022. Appellant fails to establish that any potential prejudice resulting from the admission of the CSLI outweighed its probative value.

Moreover, though Appellant does not explicitly challenge the content of Investigator Atkins' testimony, we briefly refer to this Court's recent decision

in ***Commonwealth v. Grubbs***, 330 A.3d 444, 452 (Pa. Super. 2025). The appellant in ***Grubbs*** argued the detective who testified concerning the appellant's phone records was not qualified as an expert. ***Id.*** at 451. This Court concluded the trial court did not abuse its discretion in determining the detective did not testify as an expert in CSLI:

> [O]ur review discloses [the detective] testified that the records gave a longitude and latitude for each antenna [the appellant's] phone was connected to at a given time, after which [the detective] put the coordinates into Google to determine the location of the coordinates. [The detective] gave no further information about the operation of cell phones and towers, and thus utilized no specialized knowledge in his testimony.

***Id.*** at 452 (citations omitted).

Instantly, Investigator Atkins, similar to the detective in ***Grubbs***, testified to the contents of Appellant's call records, as provided by AT&T. ***See*** N.T., 2/12-21/24, at 971-81. Investigator Atkins identified relevant data sessions by time and identified which cell tower(s) Appellant's phone connected to during each session. ***See id.*** Investigator Atkins' testimony was limited to explaining the contents of AT&T's records, and he did not offer additional analysis or opinions that would require specialized technical interpretations of those records. ***Compare*** Pa.R.E. 702 (to provide opinion testimony, an expert's scientific, technical, or other specialized knowledge must be beyond that possessed by an average layperson and helpful for the trier of fact to understand the evidence or determine a fact in issue, and the expert's methodology must be generally accepted in the relevant field) ***with***

Pa.R.E. 701 (a lay witness may offer opinion testimony if it is rationally based on the witness's perception; is helpful to understand the witness's testimony or determine a fact in issue; and is not based on scientific, technical, or other specialized knowledge). Accordingly, our review confirms Investigator Atkins provided relevant testimony properly within his purview as a layperson. Appellant's final issue merits no relief.

Based upon the foregoing, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 05/15/2025